BEATTIE *v.* CITY OF DETROIT.

MUNICIPAL CORPORATIONS — PAVING CONTRACT — TEMPORARY STREET CROSSINGS—PERSONAL INJURIES—LIABILITY OF CITY.

Where a paving contract provided that the work should be done so as to interrupt as little as practicable the free use of the street by the public, that street crossings should be kept open so far as practicable, and that no portion of the street should be wholly obstructed without permission of the board of public works, under whose supervision the work was to be done, and temporary plank bridges were built by the contractor over excavations at various street crossings, it could not be said that, in providing such means of crossing, he acted outside of his contract, notwithstanding a further provision thereof requiring him to guard against accidents by erecting barriers around all excavations; and hence the city

was liable to a pedestrian for injuries sustained by reason of the negligent construction of one of such bridges.  GRANT, J., dissenting.

Error to Wayne; Carpenter, J.    Submitted October 11, 1901.    Decided December 3, 1901.

Case by Eva M. Beattie against the city of Detroit for personal injuries.  From a judgment for defendant on verdict directed by the court, plaintiff brings error.  Reversed.

*Rowland M. Connor*, for appellant.

*A. B. Hall* and *P. J. M. Hally* (*T. E. Tarsney*, of counsel), for appellee.

GRANT, J. (*dissenting*).    The city of Detroit, through its board of public works, made a contract with one Julius Porath to repave National avenue "in conformity with the specifications and estimates hereto attached and made part of this contract, * * * and according to all the conditions herein named."    The other parts of the contract, so far as plaintiff's counsel has considered it material to state them, are as follows:

1. "To erect and maintain a good and sufficient fence, railing, or barrier around any and all excavations necessary for said work, in such a manner as to prevent accidents."
2. "To do all work * * * in a manner to interrupt as little as practicable the free use of the street by the public."
3. "Private drives and street crossings to be kept open, as far as practicable, to the satisfaction of the board of public works."
4. "Travel upon the street or upon any intersecting street * * * shall not be hindered or inconvenienced needlessly."
5. "No portion of the roadway or street * * * shall be wholly obstructed without the direction of the board of public works, in which latter case the contractor shall cause plain and properly worded signs, 'Street

Closed,' announcing such fact, to be placed with proper barricades at the nearest cross street upon each side of such obstructed portion, and upon intersecting streets."

The further conceded statement of facts is as follows: In July, 1899, the plaintiff was a stranger in the city, visiting her aunt on Elm street. Elm street runs east and west, and crosses National avenue at right angles. The city was repaving National avenue. The work of tearing up the old pavement had been commenced several blocks south of the Elm-street crossing, and was progressing towards Elm street. A trench for the resetting of the new curbstone had been excavated along the easterly line of the National-avenue roadway to a point north of the south crosswalk of the Elm-street intersection. There is a conflict in testimony as to the width of this trench, running from 18 inches to 3 or 4 feet. The depth of the trench was about 3 feet. The old paving blocks in the roadway outside of the excavation had not been disturbed. The roadway of Elm street across National avenue had been left open for the use of the public. Barricades bearing signs of "Street Closed" had been placed, facing north and south, across the roadway on National avenue at the Elm-street intersection, to prevent the passage of teams up or down National avenue. There were no barricades or signs to prevent the passage either of teams along the roadway of Elm street across National avenue, or of pedestrians along the Elm-street sidewalks across National avenue; on the contrary, planks were placed across the trench at the intersection of the south Elm-street sidewalk, for the use of the public desiring to cross National avenue along the south side of Elm street. These planks were placed over the excavation by order of the contractor. There is no testimony that the city either knew, authorized, or sanctioned their use. Plaintiff walked along the south sidewalk of Elm street towards National avenue, and, in walking over these planks, fell, and was injured. She might have passed over to the other side of the street, or passed around the excavation in the

street.   Her claim is that the planks were unsafe; that, when she stepped upon one of them, it turned and threw her.   The court directed a verdict for the defendant, upon the ground that the contractor was acting outside of his contract in providing these planks for travelers to pass over; that the placing of the planks was not obligatory upon him, but was collateral to the contract which he undertook.

Porath's contract obligated him to protect travelers against excavations he was authorized to make by putting up fences, railings, or barriers to warn travelers, and to keep them from attempting to cross the excavations.   It contains not a sentence indicating any authority on his part to bridge these excavations, either for travelers on foot or in carriage.   Such temporary bridging was not contemplated by the contract.   The negligence of the contractor for which the city is responsible in the first instance must be an act either of omission or commission naturally incidental to the work agreed to be done.   For acts of the contractor not thus incidental to the work the city cannot be held liable until it has knowledge, either express or implied, of such acts.   Was it understood by this contract that Porath might place planks over the excavations in the street for teams to pass over, in order to interrupt as little as possible the free use of the street by the public?   Clearly not, for the contract expressly contemplated the interruption of public travel by the excavations, and expressly provided means to prevent travelers from crossing.   If Porath had obstructed the street or sidewalk by leaving a wagon or piece of machinery in or upon it at night, or by putting his tools or machinery upon the sidewalk or in the street near the excavation, would the city be liable until it had notice of such obstructions?   These are not acts of negligence provided against by the contract.   They are independent acts of negligence, for which the city is not liable without notice.   Could Porath bind the city by his act in inviting travelers to pass over the excavation on two loose planks, while the contract required him to pre-

vent such crossing by putting up barriers? No bridge was necessary in order to interrupt as little as possible public travel. A few feet would take the traveler around without any substantial delay or interruption. Besides, delays and interruptions are inevitable in such cases, and the public understand it. Plaintiff testified that "these boards were about four inches apart and about a yard long, and it occurred to me that at night it would be dangerous to walk across those boards on account of their being separated." No case is cited which involves this question. Cases of liability of municipalities for obstructions and defects in streets and sidewalks are numerous. All of them, so far as I have been able to examine, are cases where the contractor has failed to warn travelers by neglecting to put up signals, lights, or barriers, or to do something to warn travelers of the dangerous character of the situation. I find none where the contractor has assumed to make a temporary bridge for the passage of travelers.

The circuit court was right, and the judgment should be affirmed.

HOOKER, J. In excavating for the setting of the curb, the contractor had not found it necessary to wholly stop public travel across the street. It was only necessary to make a temporary walk, bridging the excavation at that point, which could be used at all times during the prosecution of the work of setting the curb, except when work was being done at that particular point. Had not the contractor provided a bridge at this point, the city might have complained of a breach of his contract, which provided that he should "do all work * * * in a manner to interrupt as little as practicable the free use of the street by the public." It provided that even "private drives and street crossings should be kept open so far as practicable," and expressly stipulated that "travel upon the street [being paved] or upon any intersecting street should not be hindered or inconvenienced needlessly." Again, it was provided that "no portion of the roadway

or street shall be wholly obstructed without the direction of the board of public works." The foregoing quotations indicate that the city had every reason to suppose that the crossing would be kept open so far as it was practicable, and, as the excavation was somewhere between 18 and 48 inches in width only, the feasibility of a plank bridge would seem palpable; and such a bridge would, if apparently stable, justify a pedestrian in crossing the gutter upon it, instead of walking around the corner in the roadway, to avoid crossing the excavation.

The law imposes upon the city the duty of keeping its ways in a condition reasonably safe for public travel. Necessarily, there must be times when they cannot be in good condition,—as when they are undergoing repairs,—and at such times travelers must heed the obvious dangers. But the city is not absolved from all care and responsibility at such times, nor can it absolve itself by turning the highway over to a contractor. As between it and the public, it must see that such portion of the way as is open for use —at least where it is so under the terms of its contract with the contractor—is kept in a condition reasonably safe under the circumstances; and if it should be kept open under the contract, it should see that the contract is performed in that respect. In other words, a city cannot, by merely contracting with somebody that he will keep the street in a condition reasonably safe (whether the contract specifies the method or not), relieve itself from the statutory liability, and impose it upon another. Thus a contractor may promise to keep a trench fenced, or signal lamps in it at night, and do neither. One injured in consequence is not without remedy against the city, for the statutory responsibility rests there. *Pettengill* v. *City of Yonkers*, 116 N. Y. 558 (22 N. E. 1095, 15 Am. St. Rep. 442); *Monje* v. *City of Grand Rapids*, 122 Mich. 645 (81 N. W. 574); *Baker* v. *City of Grand Rapids*, 111 Mich. 447 (69 N. W. 740); 2 Dill. Mun. Corp. § 1027, and note; *City of Detroit* v. *Corey*, 9 Mich. 165 (80 Am. Dec. 78); *Southwell* v. *City of Detroit*, 74 Mich. 438

(42 N. W. 118).   It is true that a temporary bridge need not
be as well built and safe as a permanent one, and it may
be that one or more planks loosly laid over an excavation,
to be used for a few minutes, or an hour, day, or week,
may be a reasonably safe substitute, for the pedestrian can
see the character of the temporary structure, and must
act accordingly, and will be held to a corresponding
degree of care.

The learned circuit judge construed the contract to
mean that it was the duty of the contractor to interrupt
travel for as short a time as possible at a particular point,
but was of the opinion that it did not require or authorize
him to substitute temporary structures for the more stable
ones in common use, and, if he did so, and persons used
them, they could only look to him for redress; and hence
that, under the circumstances of the case, the contractor
should have built no bridge, and that the public would not
then have been justified in attempting to cross the gutter,
and, if one chose to do so, he would assume the risk, so
far as the city is concerned.   This is a construction not
without force, but we think it loses sight of the provisions
of the contract requiring that the roadway should not be
wholly obstructed at a given point without authority, and
the fact that all of the work was done under the supervis-
ion of the city's board of public works, and also that these
bridges were made at the different street crossings during
the progress of the work, and the city must have known
it.   At the very least it would seem to be a question
whether the parties did not place upon the contract the
construction contended for by the plaintiff.   When we
take into consideration the fact that the usual, and per-
haps necessary, method of setting curb is to complete the
excavation for the given section, and follow it by setting
the curb, commencing at one end and going to the other,
and at a later time completing the gutter, thus necessarily
preventing completion at one point in a short time, the
construction of the contract contended for by the plaintiff's
counsel does not seem to us unreasonable.

I am of the opinion that the judgment should be reversed, and a new trial ordered.

MONTGOMERY, C. J., MOORE and LONG, JJ., concurred with HOOKER, J.