## BEATTIE *v.* CITY OF DETROIT.[1]

1. HIGHWAYS AND STREETS—SAFETY—INJURY TO PEDESTRIAN— DUTY OF MUNICIPALITY.

    Where a street undergoing repairs by a contractor is left open for travel, the city must see that it is and remains reasonably safe for travel, notwithstanding the effect of storms that may reasonably and ordinarily be expected at that season of the year.

2. SAME—NOTICE OF CLAIM FOR INJURY.

    Evidence examined and *held* to show that notice of claim for injury was served upon the corporation counsel.

[1] Rehearing denied October 27, 1904.

3. INSTRUCTIONS—CONSTRUCTION AS WHOLE.
>   In order to determine whether an instruction is misleading, the
>   charge must be considered as a whole.

4. DAMAGES—PERSONAL INJURY—FUTURE SURGICAL OPERATION.
>   Plaintiff in a personal injury case may recover for the expense
>   and pain attendant upon a future surgical operation if under
>   the evidence one is deemed necessary to effect a cure.

Error to Wayne; Mandell, J.  Submitted January 13,. 1904.  (Docket No. 30.)  Decided July 27, 1904.

Case by Annie Beattie against the city of Detroit for personal injuries.  There was judgment for plaintiff, and defendant brings error.  Affirmed.

*P. J. M. Hally* and *A. B. Hall* (*T. E. Tarsney*, of counsel), for appellant.

*Orla B. Taylor*, for appellee.

MOORE, C. J.  This action was brought to recover damages for injuries sustained by reason of the unsafe condition of the street at the corner of Jefferson and Field avenues on the evening of July 26, 1901.  There is a street-car track upon Field avenue, over which the cars of the cross-town line are operated, the cars coming from the north and turning westerly on Jefferson avenue.  The usual and ordinary place for stopping the cars to let off passengers was upon Field avenue, just before the cars turned westerly.  For some time prior to the night of the accident, the portion of Field avenue between the west track and the west curb had been in process of repavement with cedar blocks upon concrete foundation.  The method of laying this pavement is as follows: After excavating to the proper depth, the concrete is laid.  Upon this is placed a thin cushion of sand, upon which round cedar blocks, from four to nine inches in diameter, are placed.  A binder course of gravel. is then thoroughly tamped into the interstices between the blocks, and hot tar is poured over the gravel.  The tamping is to make them solid, so that the blocks won't raise.

The tar is supposed to stop the water going through, and hold the blocks together. The work is completed by a top dressing of sand. For several days the work had been progressing in a southerly direction toward Jefferson avenue, and on the day preceding the night of the accident, according to the witnesses for defendant, the blocks were all laid, up to the line of the asphalt pavement on Jefferson avenue. On account of a street-car parade, which was to start from near this point that evening, the blocks were laid temporarily; the contractor not having gravel enough to complete the last 10 or 15 feet. It was the claim of plaintiff, and is not seriously disputed, that this portion, 10 or 15 feet from the corner, was not tamped, the gravel and the tar were not in, and the top dressing was not on; that no attempt was made to barricade the street and prevent travel over this unfinished pavement—on the contrary, travel was invited; that no lights were placed there to guard the place.

The plaintiff, accompanied by her son, aged six years, arrived at the corner in question, upon a cross-town car, shortly before 12 o'clock at night. The car stopped at the usual place, and plaintiff alighted, carrying her child in her arms. The car immediately started forward, and proceeded down Jefferson avenue. It was the claim of plaintiff that the pavement looked all right; that the car passed on, and she was left in total darkness; that she started toward the westerly curb, but her feet became tangled in the blocks, which were all afloat because of a rain which had fallen earlier in the evening, and she stumbled and fell, sustaining serious injuries. The claim of plaintiff is the defendant was guilty of negligence in leaving the paving in this incomplete condition, so that a dangerous condition of the street was inevitable in case of rain, the weather being threatening, and in not providing proper lights and barricades to protect the public from the danger. The case was submitted to the jury, and a verdict rendered for plaintiff. The case is brought here by writ of error.

The counsel for appellant discuss five propositions:

1. The storm and condition of the highway.
2. Service of notice on the corporation counsel.
3. The sufficiency of the notice.
4. Damages and the mortality table.
5. Operation and cost of operation.

For convenience, we will consider these in the same order.

Counsel for the city insist that the rule requiring either actual or constructive notice of a defective street, in order to hold the defendant liable, has not been met. His position, quoting his own language, is:

"The statute permitting this class of actions does not contemplate that a pavement of any particular character shall be laid, but only that it shall be reasonably fit and safe for travel. While it is admitted that the pavement, for the space of ten or fifteen feet, had not been finished as it was intended to permanently remain, yet it had been laid for the very purpose of accommodating the crowd that was expected to be drawn by this street-car parade. These being the conditions, we insist that, before the city can be held liable for any damages resulting from an accident caused by any subsequent defect in this street, that it must have had actual notice, as the time was too short, under all decisions, for constructive notice." Citing *Wakeham* v. *Township of St. Clair*, 91 Mich. 15 (51 N. W. 696), and other cases.

An examination of the cases cited shows they relate to finished roadways in which a defect afterwards occurred, except *Beattie* v. *City of Detroit*, 129 Mich. 20 (88 N. W. 71), where temporary plank bridges were used. In that case the city was held liable for the negligence of the contractor. Justice Hooker, speaking for the court, said:

"The law imposes upon the city the duty of keeping its ways in a condition reasonably safe for public travel. Necessarily there must be times when they cannot be in good condition—as when they are undergoing repairs—and at such times travelvers must heed the obvious dangers. But the city is not absolved from all care and responsibility at such times, nor can it absolve itself by turning the highway over to a contractor. As between it and the public, it must see that such portion of the way as

is open for use—at least where it is so under the terms of its contract with the contractor—is kept in a condition reasonably safe under the circumstances; and, if it should be kept open under the contract, it should see that the contract is performed in that respect. In other words, a city cannot, by merely contracting with somebody that he will keep the street in a condition reasonably safe (whether the contract specifies the method or not), relieve itself from the statutory liability, and impose it upon another. Thus a contractor may promise to keep a trench fenced, or signal lamps in it at night, and do neither. One injured in consequence is not without remedy against the city, for the statutory responsibility rests there. *Pettengill* v. *City of Yonkers*, 116 N. Y. 558 (22 N. E. 1095, 15 Am. St. Rep. 442); *Monje* v. *City of Grand Rapids*, 122 Mich. 645 (81 N. W. 574); *Baker* v. *City of Grand Rapids*, 111 Mich. 447 (69 N. W. 740); 2 Dill. Mun. Corp. § 1027, and note; *City of Detroit* v. *Corey*, 9 Mich. 165 (80 Am. Dec. 78); *Southwell* v. *City of Detroit*, 74 Mich. 438 (42 N. W. 118)."

In order to suspend the duty imposed by statute to keep its streets which are open to public travel in good repair for that purpose, a city, while grading and paving a street under the power conferred by its charter, must close to public travel that portion thereby rendered unfit or unsafe. *Southwell* v. *City of Detroit*, 74 Mich. 438 (42 N. W. 118); *Alexander* v. *City of Big Rapids*, 76 Mich. 282 (42 N. W. 1071); *Walker* v. *City of Ann Arbor*, 111 Mich. 1 (69 N. W. 87).

Upon this branch of the case the judge, charged the jury:

" If the city of Detroit left the street at 6 o'clock in the evening in a condition that was proper and fit to be traveled over by horses, bicycles, wagons, and such, at that time, it does not necessarily follow that it was left in a reasonably safe condition. Something more, in my opinion, is required of the city. The city is required to leave that street in such condition that it will remain in the condition in which it was put; that is, if it was put in a condition at 6 o'clock reasonably safe and fit for public travel at that time, then the further duty falls upon the city to consider what the elements are, and to consider what is

likely to occur during the night; and they are required by law, in my opinion, to put it in such a condition that it will stand or withstand the elements or conditions that might reasonably and ordinarily be expected at that season of the year. So, gentlemen of the jury, the principal fact in this case left for you to determine is, Did the city leave that street in a condition in which it would be expected it would remain in a condition that was reasonably safe? Did they do all that prudence and foresight would demand of them? In other words, if the rain and storms that might be expected, if you believe that they might be expected at that time of the year, would put that street out of repair and render it dangerous, then, gentlemen of the jury, in my opinion, negligence would be chargeable against the city; but if you find that a storm of unusual severity, or a storm that might not be expected under ordinary circumstances and conditions at that time of the year, came up, then it is something human foresight cannot see or prevent, and that would be an extraordinary visitation of the elements, and the city of Detroit would not be, in such a case, chargeable with negligence."

We think this a proper instruction, under the facts disclosed by the record.

The service of notice and its sufficiency may be considered together. The accident occurred July 26, 1901. The statute (Detroit Charter 1895, Act No. 463, Local Acts 1895, § 46) provides that "notice shall be given in writing within three months from the time of such injury, to the head of the law department or to his chief assistant." The corporation counsel is the head of the law department of the city. At the time of the accident, Mr. Tarsney was corporation counsel. On August 3, 1901, Conely & Taylor wrote the following letter to Mr. Tarsney, addressing him in his official capacity, as corporation counsel:

"On the evening of July 26, 1901, Mrs. Annie Beattie, No. 30 Garland avenue, was injured at the corner of Field and Jefferson avenues, and we expect to file a claim for damages on her behalf against the city. We are waiting to determine the exact extent of her injury, as we do not wish to ask for any more than she is fairly entitled to, if the city is liable. I am informed this morning that her injury is more serious than we anticipated at first, and

thought possibly you would like to have her examined by your own physician. You are at liberty to do so if you desire."

This letter was placed in the hands of the office boy, Matthew Murphy, for delivery at Mr. Tarsney's office. Murphy swears that he knew the location of Mr. Tarsney's office, and that he delivered the letters at his office, and, while he could not swear to the delivery of a specific letter, that none were ever given to him to deliver that he did not deliver.

On October 14, 1901, another letter was addressed and delivered in a similar manner to Mr. Tarsney's office. This letter read as follows:

"We desire to again call your attention to the accident to Mrs. Annie Beattie to which we called your attention on the 3rd day of August, 1901. The accident occurred at the corner of Field and Jefferson avenues on July 26, 1901, at about 11 o'clock p. m. The cause of the injury was the unsafe and improper condition of the street and the absence of warning lights and signals. Mrs. Beattie suffered a very severe injury to the spine and is otherwise injured internally. Her physician states that the injury is probably of a permanent nature."

Mr. Taylor's testimony is that, from the day of the delivery of these letters to the office boy, they were never seen by him until delivered to him upon the trial by Assistant Corporation Counsel Hally. No one from the office of the corporation counsel testifies they were not received. It is a presumption under such proof, that the notices were received by the corporation counsel. But this is not all. The record of the proceedings of the common council, under date of October 15th, shows that the petition was received, and referred to the committee on claims and accounts. Mr. Taylor also testified—and this is not disputed—that, after the petition was presented to the common council, he was told by the clerk, and also by Mr. Hally, that he would be notified when the committee would take up the claim; that he afterwards was notified in writing; that he appeared before the committee, and Mr. Hally also

appeared before it, representing the corporation counsel's office, and the plaintiff and two or three witnesses were sworn. In March the committee to whom the claim was referred reported to the common council, among other things:

"We beg leave to report that we have carefully considered same, and, after listening to the testimony of the claimants, as well as that of several witnesses, and after consultation with the corporation counsel, have come to the conclusion that there is no legal liability against the city in either case. We therefore recommend that the prayers of the petitioners be denied."

This report was adopted by the council—all indicating the receipt of the notice in proper time.

Did the court err in his charge as to the effect of the mortality tables and in relation to damages? Complaint is made of the following:

"She is also entitled to compensation for all of the pain and suffering which she has endured since the time of the accident, and that she is likely to endure in the future. In considering these questions, you have a right to consider her age. At the time of the injury, she was 36 years of age, and, in accordance with the mortality tables of the State of Michigan, she has an expectancy of life of 31 years and upwards. In computing the amount which she would earn during that period, it is your duty to give her the present worth or value of what she would earn."

It is said:

"The charge allows the jury to assess damages for pain and suffering which the plaintiff 'may endure hereafter,' and for the loss of time 'as the evidence convinces you she will be likely to suffer hereafter.' The rule is that the alleged permanent disability, in order to be a ground for damages, must be one that is reasonably certain to result from the injury complained of."

The testimony of the plaintiff and her father was that previous to the accident she was in perfect health. There was also testimony that the injury was a permanent one. No request was made that the court should give a fuller

charge as to the use to be made of the mortality tables, or what constituted present worth or value. This portion of the charge should be considered in connection with what followed it. The jurors were instructed:

"I might add that, in computing the damages that a person is entitled to for pain and suffering, the law has no standard by which to go. It is left to the sound judgment and discretion of the jury. It is not an arbitrary power left to the jury, to be exercised arbitrarily. * * * You have no right to award anything in the nature of punishment. You must try and make the person injured through the negligence of the defendant whole, so far as money consideration can do so, but you should give nothing further than compensation."

Taking the charge as a whole, we do not think the jurors were misled. See *Bailey* v. *City of Centerville*, 108 Iowa, 20 (78 N. W. 831). As to the use of the mortality table, see *Nelson* v. *Railway Co.*, 104 Mich. 582 (62 N. W. 993).

Testimony was allowed to be given as to the cost of an operation. The judge charged the jury that she was entitled to compensation "for the pain she may suffer from an operation, if an operation is deemed necessary." It is said this is error, because whether an operation is necessary is purely a matter of judgment. At best, it is a conclusion as to what is the best thing to be done. Counsel say:

"Nature in many instances may be able to assert itself and become master. Health may be regained and strength may return without an operation. The patient might continue to refuse to submit to an operation. The experience of ordinary individuals proves that there are in this world any number of physical cowards, and this mental temperament of the individual might forever prevent the patient consenting to the physician's plan. So that the giving of damages for the pain incident to an operation, or for pain which would result from an operation, is clearly the giving of damages which rests in an uncertainty, and for a consequence which is not reasonably certain to follow an injury sustained. It is a mere speculation, for which damages cannot be given."

The physician who gave testimony for the plaintiff was of the opinion that the injury would not yield to medical treatment, and, without surgical treatment, would remain as it is. Dr. Weber, who examined the plaintiff, and was a witness for the city, though he did not agree with the witnesses of the plaintiff as to what caused the condition the woman was in, testified:

"This condition that I find in this woman will last forever if she never has anything done in the way of treatment. An operation will cure it.

"Q. All these operations are serious, are they not?

"A. Laceration of the neck of the womb is considered a slight operation. I never knew of a case terminating seriously or fatally."

He agreed with the witnesses for the plaintiff as to what the cost of an operation would be.

In 1 Joyce on Damages, § 196, it is said:

"It may in some cases of injury be necessary to perform a surgical operation in order to effect a cure. Where such an operation is required in order to give relief or to bring about a cure, and it is attended with slight inconvenience and no danger, it is held that if a person, under such circumstances, refuses to submit to an operation, there can be no recovery of damages attributable to such failure."

In *Blate* v. *Railroad Co.*, 44 App. Div. 163 (60 N. Y. Supp. 732), it is said:

" It is quite evident that the damages which were given by the jury were based, in a very considerable amount, upon this rupture. The evidence of surgeons was given not only as to the existence of the rupture as the result of this accident, but also as to the probability of its cure if the plaintiff would submit to a surgical operation. The defendant's expert testified that such an operation would almost certainly result in a cure; but the physicians sworn on behalf of the plaintiff, while admitting that such an operation would probably result in a cure, said that it was by no means certain. It was stated by the plaintiff's witnesses that such an operation would be dangerous to life, but the expert surgeon sworn on behalf of the defendant said it was not now really dangerous to life, although six or eight

years ago it was considered a dangerous operation. In view of that condition of the evidence, the defendant insisted that it was the duty of the plaintiff to submit to an operation, which would be practically certain to result in a cure, and, because he did not do so, he was not entitled to recover damages for a permanent or continuing rupture. On that branch of the case the learned trial justice charged the jury:

" 'Something has been said to you regarding the possibility of the plaintiff having had a radical cure effected by submitting himself to a surgical operation. I charge you upon that subject that a person who has been injured by an accident of this kind is bound to use the usual and reasonable remedies which are appropriate to alleviate or cure such an accident as he has suffered. He is not permitted to increase and enhance the damages which he has suffered by negligently or carelessly or willfully permitting his condition to get worse than it would be if properly treated. At the same time, no man is bound, for the purpose of reducing the amount of damages which he may be entitled to recover from a person who has done him wrong—no man is bound to submit himself to a surgical operation which may, even in the remotest degree, be an operation attended with danger. That is a matter which he must determine for himself; and if he, through apprehension, or for any other cause, has determined that he will not submit himself to such an operation, the defendant is not entitled to take advantage of his failure to do so. At the same time, you are to take into consideration, determining the amount of injury which this man has suffered, and the permanency of his injury, all the testimony that you have heard from the experts upon the subject of the possibility of curing a disease of this kind by a surgical operation, and the slight inconvenience which is said to result from such operation in most cases.'

"To this charge as an entirety an exception was taken. Counsel for the defendant insists that the charge was erroneous, but he made no request to the court to modify it, or to charge more fully upon any proposition contained in it, so that, if the propositions charged are correct, defendant cannot complain that the court should have charged more fully in regard to them. The rule of damages in such cases is not at all doubtful. It is that the party who claims to have suffered damage by the tort of another party is bound to use reasonable and proper efforts to make the damage as small as practicable, and that he is not entitled to recover for any damage which by the use

of such efforts might have been avoided, because they are not to be regarded as the natural result of the tort. 8 Am. & Eng. Enc. Law (2d Ed.), p. 605. The question in every case is whether the plaintiff has used such means as were at hand to reduce his damages as a reasonably prudent man would have used. It cannot be said, as a matter of law, that he is bound to use any particular means or to do any particular thing, unless that thing is one which would necessarily result in reducing the damage, and which a reasonable and prudent man would use. If in any given case it appears that the particular means which may be used to effect a cure would or might cause greater injury or produce serious results, quite clearly the injured person would not be called upon, as a matter of law, to take the chances of suffering more serious injury or death for the purpose of reducing the damage. While the person who inflicts the damage has the right to say that sure and safe means to diminish the evil results of the accident, if any such exist, must be used, yet that is the extent of his right. Whether further means should be resorted to is for the plaintiff to determine. In making that determination the plaintiff has the right to consider the nature of the means used to effect a cure, and a possible or probable effect upon himself. He has to determine for himself whether he is to resort to those means in view of those considerations. In any given case it may be that the treatment which is given to the plaintiff is not the best that could be devised, but the plaintiff is not the less entitled to his damages on that account, if, in taking that treatment, he has consulted such a physician as a reasonably prudent man would consult. The jury, in getting at the damages, are to say not only what they are, but whether the means used by the plaintiff to reduce the damages were such as an ordinarily prudent man would use. They cannot say that he should or should not have taken the advice of any particular physician, nor that he should have obtained any particular kind of treatment. As to that, he must himself be the judge. But when he has determined what treatment to take, it will yet be for the jury to say if, in making that determination, he used the means that a reasonably prudent man would take to cure himself of his injury. If he did, he is entitled to recover for his damages as they are presented to the jury. If he did not, and the jury can say that some other treatment would have brought about a cure, and that treatment was one that a reasonably prudent

man would have submitted to, then they must say that he has not used the care which a reasonably prudent man would use to reduce the damages, and must take that into consideration in reaching their verdict. That is what was substantially said to them by the learned trial justice. The law lays down no hard and fast rule as to the duty of the plaintiff under such circumstances. Whether an operation for his ailment, which might endanger his life in any degree, must be submitted to, is a question which the law cannot answer; nor does it lie in the mouth of a jury to say that the plaintiff should or should not do any particular thing. They are concerned simply with the affairs presented to them at the trial, and whether the damages then appearing to exist are the natural and probable result of the injuries, diminished by the efforts for a cure which a reasonably prudent man would have made."

See, also, *Bailey* v. *City of Centerville*, 108 Iowa, 20 (78 N. W. 831).

The case was carefully tried, and, we think, is free from reversible error. Judgment is affirmed.

CARPENTER, GRANT, and MONTGOMERY, JJ., concurred. HOOKER, J., did not sit.