NORRIS *v.* DETROIT UNITED RAILWAY.

1. STREET RAILROADS — NEGLIGENCE — PERSONAL INJURIES — PAVE-
MENTS—EXCAVATION IN STREET—LIGHTS—CROSSINGS.

On the trial of a personal injury action brought against
a defendant street railroad company for injuries sustained
by falling into an excavation made in the street which
plaintiff claimed was not lighted, defendant's contention
being that it had furnished sufficient lights which had
been extinguished by a heavy wind and rain storm im-
mediately before the accident, the question whether or
not the storm was such that it might reasonably be ex-
pected during the month of June, when the injury oc-
curred, was a proper question for the jury upon conflicting
testimony; the court was not required to withdraw from
the jury the question of fact upon the theory of the de-
fendant that the storm was, as matter of law, extra-
ordinary.[1]

2. SAME—INSTRUCTIONS—TRIAL.

It was the duty of the court, however, to instruct the jury
that if they should find the storm was an unusual one
such as defendant would not be required to anticipate in
the exercise of ordinary care, that it was for the jury to
determine whether defendant had had a reasonable time
in which to restore the lights before the occurrence of
plaintiff's injury, and if such reasonable time had not
elapsed, then plaintiff could not recover.

3. EVIDENCE—EXPERT TESTIMONY—HEARSAY—PAIN AND SUFFERING.
Testimony of defendant's physician, on cross-examination,
who examined her ankle, that in making the examination
plaintiff flinched, was hearsay testimony and should have
been excluded from the evidence.

Error to Wayne; Hosmer, J. Submitted January
18, 1915. (Docket No. 123.) Decided March 18,
1915.

---

[1] Upon the liability of a street railway for injuries caused by
defects in track or street, see notes in 52 L. R. A. 448 and 15
L. R. A. (N. S.) 840.

Case by Myrtle I. Norris against the Detroit United Railway for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Corliss, Leete & Joslyn* and *William G. Fitzpatrick,* for appellant.

*William M. Mertz* (*William MacPherson,* of counsel), for appellee.

STONE, J. The plaintiff, an unmarried woman about 24 years of age, brought this action to recover damages resulting from her falling into an excavation made by the defendant in the course of the construction of its tracks in the city of Detroit. In June, 1911, the defendant was building a track on Grandy avenue north from Gratiot avenue, in said city. One block north of Mack avenue, Grandy crosses St. Joseph street at about right angles; the latter street running east and west. Grandy avenue at this time was a paved street; St. Joseph was not. There is a depression in Grandy avenue between Alexandrine avenue on the north and Mack avenue on the south, with the lowest point at St. Joseph street, which is 5.2 feet lower than Alexandrine and 1.3 feet lower than Mack avenue. An excavation 7 feet wide and about 22 inches deep, measured from the top of the pavement, had been dug in the center of Grandy extending north and south from St. Joseph street for some distance beyond, in both directions. Temporary crossings at street intersections were required by the city. There was no dispute that such a crossing had been provided at St. Joseph street for vehicular traffic. It was made of ties and planks laid lengthwise in the trench for its entire width and depth. Whether there had also been a foot passenger crossing provided on the south side of St. Joseph street in the line of the sidewalk prior to the accident in question is disputed in the evidence. Between 9:30 and 10 o'clock on the

night of June 4, 1911, the plaintiff, accompanied by her mother and sister, was returning to her home going east on St. Joseph street. They lived a little over a block east of Grandy avenue, and their way lay across the latter avenue. When they reached Grandy avenue, the plaintiff, the foremost of her party, stepped or fell into the excavation at a point in the line of the sidewalk on the south side of St. Joseph street. She and her companions testified that there was no light on the crossing. A somewhat severe electrical storm, accompanied by what was claimed to be an unusually high wind and a heavy rainfall, raged in Detroit from at least 8 until nearly 10 o'clock of the night in question.

The railway company had provided sufficient lanterns to light every street intersection, in the line of the excavation, with eight lights. It had also put two men to the task of lighting the lights and seeing, by patroling the district, that they were kept lighted. It was the claim of the defendant, and it gave evidence to support that claim, that these men had placed lighted lanterns at the intersection in question prior to the storm. There was evidence that the storm was of sufficient violence to put out the lights.

The declaration charged the negligence to be that there were no lights at this place at the time of plaintiff's injury, and it was claimed upon the trial that the defendant was negligent in failing to provide a sufficient force of men on the job to keep the lights burning during and after the storm, and that the men provided were negligent in not seeing that any lights put out by the storm were relighted before the injury. Owing to the topography at the scene of the accident, large quantities of water accumulated in the trench at this point. When the plaintiff went into the excavation, she was completely immersed up to her chin. In falling, she claimed to have seriously sprained and

injured her ankles, and at the time of the trial it was claimed that her left ankle was weak and impaired, and more or less permanently injured.

The pleadings were silent upon the subject, but the evidence disclosed that some time previously the plaintiff had been suffering from a species of goiter, called "Graves" disease, and it was claimed that her condition in this respect was aggravated principally from the shock.

The evidence offered on the part of the plaintiff was of a very positive nature that there was an entire lack of lights at the time and place of the accident.

On the part of the defendant there was evidence tending to show that the lights were burning before the storm. This testimony was given by one Kolb, who testified that he and one Dooley, who was dead at the time of the trial, had the territory lying from Forest avenue at the north to Gratiot avenue on the south of St. Joseph street. He testified on direct examination as follows:.

"*Q.* How many lights, do you remember, did you have at St. Joseph street, at Grandy—just tell us how many lights?

"*A.* Oh, we had all the time four, and four on the road; that makes eight altogether.

"*Q.* On the crossing?

"*A.* Yes, sir.   *   *   *

"*Q.* Before this heavy wind came up, were all the lights lit on St. Joseph street?

"*A.* Yes; all over.

"*Q.* Now, do you know whether the wind blew those lights out or not?

"*A.* Oh, yes, tipped the lights over—the rain and the wind blew out the lights, and the city lights was gone out the same way for a while, too.

"*Q.* Now, after the lights on St. Joseph street were blown out by the wind, did you and Dooley come along and relight them again?

"*A.* Yes.

"*Q.* And do you know whether they were blown out again?

"*A.* Not after that

"*Q.* Not after the storm?

"*A.* No, then the wind lay off."

He testified to a heavy rain and storm, and that he went under cover over on Mack avenue.

"*Q.* When it stopped raining, did you go back on the job?

"*A.* Right away, when the lights was put all in shape."

He further testified that they had plenty of lights, which consisted of lanterns properly trimmed and in condition.

We infer from this testimony that the relighting testified to by this witness, in all probability, occurred after the injury of the plaintiff. The testimony of this witness was somewhat weakened by his cross-examination, which was lengthy, and from which we quote a small portion only. The witness testified that he and Dooley divided the work of lighting lanterns between them:

"*Q.* Some nights he would take the upper end and some nights you would take the lower end?

"*A.* Yes, sir.

"*Q.* To light these lights?

"*A.* Yes, sir.

"*Q.* Which end did you usually take—the lower end or the upper end?

"*A.* I was on the back end.

"*Q.* On the north end?

"*A.* On the north side.

"*Q.* Which end did you take on Sunday night—the north end?

"*A.* I don't know.

"*Q.* He lit the lights on one end, and you lit the lights on the other?

"*A.* We lit them all on the box.

"*Q.* I say, he would light them on one end of the route and you would light them on the other?

"*A.* Yes, sir.

"*Q.* Where did the north end of the route end—at what street did you divide your division?

"*A.* On Forest avenue.

"*Q.* So one of you would work up from Gratiot to Forest, and the other would work up from Forest to the other end?

"*A.* Yes, we had so many streets.

"*Q.* But you don't know on the night of June 4th, on Sunday night, which end one of you had, the upper and which had the lower end?

"*A.* No, I cannot tell anything about that.

"*Q.* You cannot tell anything about that?

"*A.* No, I cannot go on to count that. ·

"*Q.* If you had the upper end, you stayed all night at the upper end?

"*A.* Yes, and we walked up and down.

"*Q.* And if he had the lower end he would stay all night at the lower end?

"*A.* Yes, sir.

"*Q.* You would walk up and down your division?

"*A.* Yes, sir.

"*Q.* And he would walk up and down his division, but you could not tell which division you were in that night?

"*A.* No."

There was evidence tending to show the velocity of the wind and the amount of rainfall. The inspector of the United States weather bureau testified, from the official records, that at 8:52 p. m. the velocity of the wind on the Majestic building was (a north wind) 59 miles, and at 9:06 (northwest) 38 miles, and at 10:23 (north) 28 miles an hour; that the wind movement was general throughout the city; that the rainfall was general over the city; and that the entire rain that fell during the entire day of 24 hours was .62 inch. This same witness testified that it rained continuously from 8:43 to 10:02 p. m., accompanied by thunder. There was evidence also tending to show that the wind was blowing at 10 o'clock.

The trial took place a year and nine months after the injury, and the plaintiff and her witnesses, including her physician, testified that she still suffered from her injuries, and that her left ankle was impaired and

weakened.  After plaintiff's physician had testified in chief, defendant requested an examination by its physician, Dr. Sanderson, with a view of qualifying him as a witness.  Such examination was made in the presence of Dr. Jaeger, the plaintiff's physician. After such examination Dr. Jaeger was recalled by defendant for cross-examination, and testified he witnessed the examination made by Dr. Sanderson. Upon redirect examination of Dr. Jaeger the following occurred:

"*Q.* Do you know whether or not, during the examination yesterday, there was any manifestation of pain on the part of the patient?  (Objected to as incompetent and self-serving.)

"*Mr. Mertz:* The examination took place after the adjournment of this case yesterday.

"*The Court:* I think he may testify to any objective symptoms.  Note an exception.

"*A.* Yes, sir.

"*Mr. Fitzpatrick:* I move to strike out the answer as incompetent.  The question was whether there was any exclamation of pain.

"*The Court:* Manifested.  I think he may testify to any objective symptoms that he saw.

"*Mr. Fitzpatrick:* I want the record to disclose the fact that the examination was being made by a physician of the defendant, to testify as a witness in this case—made for such purpose to the knowledge of the plaintiff herself. I therefore, under those circumstances, assert that anything in the way of manifestations or of exclamations are incompetent and improper.

"*The Court:* I think, with reference to that, he may testify to any manifestations—to any objective symptoms shown at such examination of the plaintiff.

"*Q.* What objective symptoms as to the manifestation of pain were there, if any?

"*A.* What do you mean—by visual signs, what I saw?

"*Q.* Exactly.

"*A.* I did not see any visual sign of pain excepting an exclamation from the plaintiff when the doctor—

"*Mr. Fitzpatrick:* That is objected to. That is the thing I say is improper—exclamations of pain.

"*The Court:* I think exclamations of pain may be given if it was a pure exclamation.

"*Mr. Fitzpatrick:* If there is any element of doubt in your Honor's mind, I would be willing to submit authorities. Exclamations made under those circumstances are highly improper, I believe, under the authorities.

"*The Court:* Very well; put it in at your peril.

"*Mr. Fitzpatrick:* Also on the strength of the doctor's last answer that there were no visible signs —no objective symptoms—I move to strike out the answer as incompetent. The answer just before that which was 'yes,' as to whether manifestations of pain were made.

"*Mr. Mertz:* I am willing to have that word 'yes' stricken out.

"*The Court:* Strike it out.

"*Mr. Mertz:* I understand exclamations of pain are objective symptoms—something you can hear— if it was manifest to this doctor, as a medical man, as a pure manifestation of pain.

"*Mr. Fitzpatrick:* Counsel is laboring under an entire misapprehension of the rule with reference to objective symptoms. Exclamations of pain have never, to my knowledge, before been categoried as objective symptoms.

"*Mr. Mertz:* Well, that is true, strictly speaking. I want to know whether there were any exclamations of pain which were apparent to you to be pure exclamations of pain?

"*A.* When Dr. Sanderson manipulated the limb she said it pained her. I saw when Dr. Sanderson manipulated the limb she said it pained her.

"*Mr. Mertz:* That may be stricken out.

"*Mr. Fitzpatrick:* I except to the statement, and I object to the attempt to cure the error. It has been put in. Note an exception.

"*The Court:* Note an exception."

Later Dr. Sanderson was called as a witness on behalf of defendant, and in the course of his cross-examination the following occurred:

"*Q.* Did she manifest any tenderness in the examination you made? (Objected to as incompetent.)

"*The Court:* I think you may ask if she flinched—did she flinch under it?

"*A.* She said it pained her.

"*Mr. Fitzpatrick:* Object to that and ask that it be stricken out.

"*The Court:* That may be stricken out.

"*Q.* Did she scream?

"*A.* No, sir.

"*Q.* She did not flinch?

"*A.* She drew her foot away. She remarked at the time it pained her, and drew her foot away.

"*Mr. Fitzpatrick:* I move to strike that out.

"*The Court:* That may be stricken out.

"*Q.* Did she flinch?

"*Mr. Fitzpatrick:* I move to strike out the answer as incompetent and self-serving—that she flinched. I move that it be stricken out—she drew away her foot —as self-serving and incompetent.

"*The Court:* Let it stand. Note an exception.

"*Q.* To your eye—an experienced eye of a medical man—while you made that examination, were there any signs of pain? You would not say there were not, would you?

"*A.* In an examination?

"*Q.* Yes.

"*A.* On deep pressure, I probably elicited pain, but I would expect that.

"*Q.* You would expect that?

"*A.* Yes, sir.

"*Q.* Now, is it possible for a person, situated as this young lady was situated, to fall into an excavation, filled with cold water, on a dark night, and receive a severe nervous shock such as she did receive?

"*A.* Certainly it is possible for anybody.

"*Q.* Whether they are well or sick with goiter?

"*A.* Certainly.

"*Q.* Is it possible to get a permanent nervous injury from the fall?

"*A.* The possibilities are unlimited; certainly it is possible. You can do all kinds of damage with a fall. I would attribute the aggravation of her condition after the accident to the injury.

"*Q.* To the accident?

"*A.* Yes, sir.

"*Q.* There is nothing else in God's world to attribute it to, is there?

"*A.* No, sir.

"*Mr. Fitzpatrick:* Doctor, you said there was some pain on deep pressure, such as you might expect in any case. Why do you say that?

"*A.* On deep pressure on the left ankle over the tendon that runs down; that is, just back of the little toe, it was severe pressure that elicited pain."

At the close of all the evidence in the case, the defendant moved for a direction of a verdict in its favor, on the ground that there was no evidence of any of the several acts of negligence charged in the amended declaration. The motion was denied, to which defendant excepted. Whereupon the defendant requested the court to charge the jury to the same effect, which was refused. In the course of its charge to the jury the trial court used the following language:

" (If the intersection was not sufficiently lighted by the proper lights and usual lights that are placed at such places, and if you find that the plaintiff was in the exercise of ordinary care—such reasonable care as a party under like circumstances should exercise—then, of course, the plaintiff would be entitled to a verdict at your hands.)

"*Mr. Fitzpatrick:* Now I direct your honor's attention right there to the statement that the crossing was in the line of the sidewalk. I understood the case was to be submitted—

"*The Court:* I am going to say there is no doubt about that fact; there is no question about that. Of course, gentlemen of the jury, I do not mean to say that it was essential to lay planks precisely over the excavation—precisely at that point—(but, of course, if planks were not laid over at the intersection of the southerly sidewalk with Grandy avenue, it should have been so lighted at that point as to indicate to them that there was danger in passing over what would be a continuation of the sidewalk. Of that, of course, there can be no question.)

185 Mich.—18.

"(You are also instructed that if this excavation at this place was left open and unguarded on the evening in question without signal lights or other warnings of approach thereto, so that the plaintiff or any other person in coming upon it would not be warned of its existence, then this crossing is not in a condition reasonably safe and fit for travel, and the plaintiff or other pedestrians could not be expected—could not necessarily be expected to be on the lookout for such a situation—that is to say, if they had no knowledge of that, of the existence of it, and there was nothing there to indicate, gentlemen of the jury, that there was this excavation, they certainly could not be expected to anticipate that the excavation was there, and I charge you, therefore, if you find from the evidence in this case that such a situation existed at this particular place, and the plaintiff herself, while in the exercise of ordinary care and free from negligence on her part, while passing over at this intersection, fell into the excavation, then it would be your duty to return a verdict for the plaintiff for such damages as will compensate her.)    *    *    *

"Now, on the part of the defendant, I think I may say, as I said before, that it is not essential, that I know of, that a crossing should have been built in the line of the southerly sidewalk. (I think it ought to have been sufficient if a sufficient walk was built in the center of the street, as has been testified to, but still in that connection you may bear in mind the testimony of the city inspector that such a walk had been provided at that place, and I say again to you, gentlemen of the jury, that if such walk were not built there would be, of course, more necessity for the putting of lights to indicate the excavation and the maintenance of such light while put there.)    *    *    *

"(If the jury should believe the walk was removed or disturbed by trespassers or others over whom they have no control at any time after Saturday night or before the accident happened, then I charge you that this would not be, under the evidence in this case, negligence for which the defendant would be liable to the plaintiff. That is undoubtedly so, gentlemen of the jury, but the necessity to guard the excavation which exists, of course, would remain, because there would be necessity for watchmen, and the necessity to

guard if the sidewalk or crosswalk had been taken up.)

"I am asked to charge you that the defendant is not legally chargeable with the results of the storm which is shown to have been of unusual severity, nor was it in duty bound to anticipate the effects of the elements upon its crosswalk; and if you find it had constructed the same with reasonable care, if you believe the storm or the rain which fell with it caused the walks to become unsafe, submerged, or to float away, then the defendant cannot be said to be negligent or liable for injuries which resulted approximately from such condition. I think that is so, gentlemen of the jury (but, as I said before, if the storm was of such severity at that time as to render the force of watchmen upon the job insufficient to light the light and sufficient time had intervened for the city railway to have put on—the defendant in this case to put on a larger force of men—I think, gentlemen of the jury, under such circumstances, it may have been requisite for them to have placed the light in such a position, if it was not there before, as to have given a warning of the existence of the excavation, but not otherwise).

"Under the evidence in this case, I think you must find defendant had upon the work, at the time of the accident, a reasonably sufficient number of lanterns, properly supplied and properly equipped to provide all necessary warning and signals; and if you believe from this evidence that eight of those lanterns were placed at or near the crossing in question, and were lighted and so placed, gentlemen of the jury, as to afford a warning of the excavation, and if the same were blown out by the wind that prevailed, or put out by the rain at that time, then I charge you that the defendant would not be responsible for the action of the elements, and the fact, if you find it so, that the lights were not going when the plaintiff attempted to cross, would not be negligence for which the defendant would be liable to the plaintiff. I think that is so (except, gentlemen of the jury, as I said before, if sufficient time intervened for the agents of the defendant to have lighted these lights, and they failed to do so, then under the existing circumstances, of course, gentlemen of the jury, it would be the same as if the lights had not existed)."

The jury returned a verdict for the plaintiff in the sum of $1,000, and judgment was entered accordingly.

The defendant has brought the case to this court by writ of error. The errors assigned upon the charge appear in parentheses in that portion of the charge above quoted. Error is assigned also upon the rulings of the court in receiving the evidence, above quoted, of Drs. Jaeger and Sanderson. The errors raised are discussed by the appellant under the following heads:

(1) That there was no proof of negligence, and the court should have directed a verdict for the defendant.

(2) That the court erred in submitting to the jury the question of whether the intersection was lighted by proper lights, independent of the question of whether the lights had been put out by the storm, or were seasonably relighted after the storm subsided.

(3) That the court erred in submitting to the jury the question whether the railway furnished a sufficient number of watchmen to properly guard the intersection, and whether sufficient time elapsed after the subsidence of the storm, and before the accident, to permit the lights to be relighted that had been extinguished thereby.

(4) There was error in the admission of the testimony of the two physicians as to complaints of pain by plaintiff, and her flinching, at the time when she was examined by defendant's physician, in order to qualify him as a witness in the case.

The last assignment of error is as follows:

"The charge of the court on the question of whether there were lights on the crossing, and the duty of the defendant to have such lights there, and lighted at the time of the accident, and the duty of the defendant to have watchmen at the scene of the accident, if the lights were not lighted, or had been put out by the storm, considered as a whole, was erroneous, inconsistent, and confusing, and well calculated to mislead the jury."

1. The first three propositions of appellant are discussed together, and the defendant contends that the evidence is undisputed that a sufficient quantity of lights had been provided by the defendant to properly light the excavation, and, in fact, the court so charged the jury; that, if the lights were not burning at St. Joseph street at the time of the accident, they had been put out by the wind and rain; that the evidence is uncontradicted that the storm was of unusual severity, and of such a character as to prevent the possibility of keeping the lanterns lighted during its progress. The defendant further contends that the evidence in substance agrees that the accident occurred about 10 o'clock in the evening; that the evidence clearly shows that the wind and rain put out the lights that had been set to guard this very crossing, and that defendant could not keep the lights lighted, nor relight them, if they were out, while the storm raged; that there was a wind velocity at that time of 28 miles an hour; and that the real question is: How soon after the storm ceased was it practicable to set about repairing the damage it had done, and how soon after that did the defendant's agents act?

We are not able to agree with defendant's counsel that the court should have instructed the jury, as a matter of law, or undisputed testimony, that the storm was an unusual and extraordinary one. We think that a question of fact was presented by the testimony. Neither do we agree with the contention that a verdict should have been directed. We are of opinion, however, that the jury should have been instructed more explicitly than they were upon the subject. We think the rule applicable here is stated by Elliott on Roads and Streets (3d Ed.), at section 1163, as follows:

"The duty of a public corporation does not demand

of it that high degree of care which would be necessary to keep its roads and streets absolutely safe for passage at all times and hours, and therefore it is not ordinarily liable for injuries produced by defects caused by sudden and violent storms and extraordinary floods. In many cases an action may be successfully defended upon the ground that the injury resulted from an extraordinary flood, and in no case is a corporation liable for a defect, or an obstruction, in a highway produced by sudden, violent, and unforeseen storm, until it has had a reasonable time in which to remove the obstruction or remedy the defect."

See cases cited by the author.

If the jury should find, as matter of fact, that the storm was an unusual and extraordinary one, and one which the defendant could not, in the exercise of ordinary care, reasonably expect, we think the question then should have been clearly put to the jury whether the defendant had had a reasonable time in which to restore the lights before the accident happened; and they should have been instructed that if it had not had a reasonable time in which to restore the lights, in case the storm was of such a nature, then there would be no liability. Whether it was such a storm as it might reasonably expect and provide for at that season of the year was also a question for the jury. The idea is embraced in the charge of the court in *Beattie* v. *City of Detroit*, 137 Mich. 319, at page 324 (100 N. W. 574, at page 576), where the charge of the trial court was approved by this court:

"Did they do all that prudence and foresight would demand of them? In other words, if the rain and storms that might be expected, if you believe that they might be expected at that time of the year, would put that street out of repair and render it dangerous, then, gentlemen of the jury, in my opinion, negligence would be chargeable against the city; but if you find that a storm of unusual severity, or a storm that might not be expected under ordinary circumstances and conditions at that time of the year, came up, then

it is something human foresight cannot see or prevent, and that would be an extraordinary visitation of the elements, and the city   *   *   *   would not be, in such a case, chargeable with negligence."

And the rule of reasonable time in which to remedy the defect would apply.

We have quoted extensively from the charge of the court, and most of it cannot be justly criticised, but we fear the jury failed to understand from the charge that a reasonable time in which to restore the lights, in any event, should be given to the defendant, before there would be liability in case the storm was an unusual and extraordinary one which put out the lights. This question of reasonable time in which to make repairs in cases of severe storms has been before this court in numerous cases, including cases against railroads for destruction of stock, where fences have been destroyed by violent storms. *Robinson* v. *Railway Co.*, 32 Mich. 322; *Stephenson* v. *Railway Co.*, 34 Mich. 323. The question of reasonable diligence is involved in all that line of cases. That the crossing was a place that required lighting, in the first instance, is not denied.

2. We are constrained to hold that the court erred in admitting the evidence of the physicians, above quoted. We have examined the testimony with great care; and while there is some confusion, in the colloquy between court and counsel, which leaves it somewhat in doubt as to what was intended by the rulings, yet we think it does sufficiently appear that the court permitted, and the jury understood that the court permitted, the evidence as to the flinching of the plaintiff to stand in the case. In the testimony of Dr. Sanderson the following appears:

"*Q.* Did she flinch?
"*Mr. Fitzpatrick:* I move to strike out the answer as incompetent and self-serving, that she flinched.   I

move it be stricken out—that she drew away her foot —as self-serving and incompetent.

*"The Court:* Let it stand. Note an exception."

This question had substantially been answered in the affirmative, and we gather from the ruling that it was permitted to stand. This subject has been so often ruled upon by this court that about all that is necessary to do is to refer to the following authorities: *Grand Rapids, etc., R. Co.* v. *Huntley,* 38 Mich. 537 (31 Am. Rep. 321) ; *Comstock* v. *Georgetown Township,* 137 Mich. 541 (100 N. W. 788) ; *O'Dea* v. *Railroad Co.,* 142 Mich. 265 (105 N. W. 746) ; *Marshall* v. *Railroad Co.,* 171 Mich. 180 (137 N. W. 89).

As this court said in *Comstock* v. *Georgetown Township,* above cited:

"It hardly needs an argument to show that flinching is an expression, if not an exclamation. Like an exclamation, it may be involuntary or it may be voluntary; and in either case it is in the nature of, or has the effect of, a declaration, and, when taken to indicate suffering, becomes hearsay, if proven by another, and therefore subject to the principle discussed."

Under the circumstances in which the manifestations testified to occurred, we think it was reversible error to receive the testimony.

For the errors pointed out, the judgment of the court below is reversed, and a new trial granted.

BROOKE, C. J., and McALVAY, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.