ORISSA M. JONES v. THE PRESIDENT AND TRUSTEES OF THE VILLAGE OF PORTLAND.

*Municipal corporations—Defective cross-walk—Trial—Statements of counsel—Evidence—Hearsay—Expert testimony—Hypothetical questions.*

1. A physician cannot testify to exclamations of pain of an injured person during an examination made in contemplation of a suit to recover damages for the injury, he being employed to make such examination to enable him to be a witness in said case, nor can he testify to exclamations and statements made upon an examination had after the commencement of said suit for a like purpose; citing *Railroad Co. v. Huntley*, 38 Mich. 544.

2. It is not competent for a physician to testify to what the plaintiff in a negligence case told him as to how the injury was received for which suit is brought; citing *Dundas v. City of Lansing*, 75 Mich. 499; *Merkle v. Bennington Tp.*, 58 Id. 156.

3. In a suit to recover damages for injuries caused by a defective cross-walk, plaintiff's attorney offered to show the general unsafe condition of the walks of the village, and coupled the offer with the statement that the walks right along the street where the accident happened, for 80 rods, were not safe for a man who was in any way infirm, or for a lady, to pass along there at night without being injured or tripped up half a dozen times, which proposed testimony was objected to and excluded, but nothing was said by the court to the jury to correct the error in practice thus committed, which offer and statement are held reversible error; citing *Dundas v. City of Lansing*, 75 Mich. 499; *Tice v. Bay City*, 78 Id. 209.

4. It was held in *Mayo v. Wright*, 63 Mich. 32, that a question to an expert witness is not objectionable on account of its length, but that it should be reduced to writing, and embrace the whole question in a connected manner.

5. It is error to permit a witness to testify to his conclusion based upon facts in evidence before the jury from which they are as competent to draw a conclusion as is the witness.

Error to Ionia. (Smith, J.) Argued October 15, 1891. Decided December 21, 1891.

Negligence case. Defendant brings error. Reversed. The facts are stated in the opinion.

*A. A. Ellis,* for appellant.

*Davis & Nichols,* for plaintiff.

CHAMPLIN, C. J. This action was brought to recover compensation in damages for a fall caused by a defective cross-walk in the village of Portland, which the village authorities neglected to keep in repair. The plaintiff recovered judgment, and the defendant brings the case here by writ of error.

The injury was received on July 20, 1888, about 9 o'clock in the evening. This was on Friday; and on the evening of Tuesday, which was the 24th, Dr. Grant and Dr. Logan, of Ionia, came to see plaintiff. She had not at that time employed them, but they were employed by her husband, who was a lawyer. He engaged these physicians for the purpose of prescribing for his wife, and for the purpose of preparing them as witnesses to testify in a suit which was to be brought to recover damages against the village. The latter purpose would seem to be the principal one. Both of them understood that to be the object when they took the case and first went to see Mrs. Jones. During the summer previous Mrs. Jones had been ill, and she then had employed Dr. Alton and Dr. Hugg to attend her. Although she did not send for nor employ the Ionia physicians in the first place, she ratified what her husband had done, and submitted to an examination by and treatment from them. This suit was brought September 15, 1888, and some of these examinations were made before and some after suit brought. The physicians were allowed to testify to her complaints and to her statements of pain made during the examination made by them; also as to tenderness and

pain in the region of her back, hip, and genital organs. They discovered a slight discoloration on the left hip, and a fullness at her right knee, which were the only indications which they found of any ailments, and which, independently of her assertions that she had been injured, they would have attributed to rheumatism.

The questions presented by the assignments of error upon this branch of the testimony are:

1. Is it competent for a physician to testify to exclamations of pain made by a party who is being examined by such physician, when such party contemplates bringing a suit to recover for the injury which she claims to suffer, and when such physician is employed with a view and for the purpose of giving testimony in such suit so to be brought?

2. Is it competent for such physician to testify to such exclamations and statements of the party upon examination made after suit is brought, and for the purpose of giving the same in evidence?

The plaintiff claims that such testimony is admissible, under the following authorities: *Hyatt v. Adams*, 16 Mich. 180; *Johnson v. McKee*, 27 Id. 471; *Elliott v. Van Buren*, 33 Id. 49; *Mayo v. Wright*, 63 Id. 32.

*Hyatt v. Adams* was an action on the case against a physician for malpractice in treating the plaintiff's wife, causing her death within four days. All there is in the opinion upon this subject is found in a single paragraph upon page 200, and reads as follows:

"The court did not err in admitting the evidence of exclamations of pain and suffering uttered by the deceased, and her complaints as to the nature of her suffering during and after the operation, though some of them were in the absence of the defendant. This is the natural and ordinary mode in which physical pain and suffering are made known to others, and the only mode by which their nature and extent can be ascertained. Such exclamations and statements are therefore original evidence. But it was, of course, open to the defendant to show, or to raise an inference, if he could, that they

were feigned, or intended to deceive. They were clearly admissible as tending to show the malpractice of the defendant, though not for the purposa of aggravating the damages."

It will be noticed that the admission of the evidence was confined to a single fact to be proved, and that was the malpractice of the defendant; and it was expressly stated that it was not admissible for the purpose of aggravating the damages. That case is not analogous to this. The exclamations of Mrs. Jones to her physicians, made four days after the accident happened, could in no manner tend to prove that she met with a fall upon a sidewalk through the negligence of defendant. It would not be competent testimony to prove the main fact in this way from statements of the party. The only bearing it could have legitimately would be to aggravate the damages, and the case cited is authority that it is not admissible for that purpose.

*Johnson v. McKee,* 27 Mich. 471, was not a case of negligence, but of assault and battery. Testimony was received showing the statements by plaintiff at various times concerning his pains and bodily sufferings. These were objected to as hearsay statements, and as declarations in his own favor. It was held by the Court that,—

"So far as they were not narrations of past as well as present sufferings, it has been well settled that such statements of present feelings are facts which furnish the best, and often the only, evidence of such physical conditions as are not open to discovery by the sight or other senses of witnesses."

The question was no further considered.

*Elliott v. Van Buren,* 33 Mich. 49, was an action for an assault and battery, and the Court said:

"The declarations of a sick person, made from time to time, concerning present sufferings and sensations

(not being relations of past occurrences), are the usual means of evidence where third persons testify on the subject."

*Mayo v. Wright*, 63 Mich. 32, was an action brought against a physician for malpractice in setting a broken leg, in which the same principle was asserted and applied.

None of these cases were actions for negligence, but the causes of action were the direct act and misfeasance of the defendant, and the testimony was admissible as bearing upon the wrongful act alleged. In each of them, also, the exclamations were at a time when motives to make testimony favorable to the party in a suit such party had brought or contemplated bringing were absent. In this case it must be borne in mind that the witnesses were employed with a view of a suit to be brought, so far as was connected with two at least of the examinations made by them, and after the suit was brought, as to the other testimony relating to her exclamations or statements of pain and suffering made to them.

In *Grand Rapids & Indiana R. R. Co. v. Huntley*, 38 Mich. 544, this Court had occasion to pass upon the competency of testimony of physicians employed as "a mere auxiliary to a lawsuit." Chief Justice CAMPBELL, in giving the opinion of the Court, said:

"It has been held several times by this Court that statements of pain and of its locality were exceptions to the rule excluding hearsay evidence.   *   *   *   These statements are admitted only upon the ground that they are the natural and ordinary accompaniments and expressions of suffering. It would be impossible in most cases to know of the existence or extent or character of pain without them. They are received, therefore, as acts, rather than declarations, and admitted from necessity. The rule which admits declarations of present suffering has never been extended so as to include declarations either of past suffering or of the causes in the past of such suffering, so as to make such statements proof of the facts. Declarations concerning the past are narra-

tives, and not acts.  Exclamations of suffering may be,. and, if honest, are, parts of the occurrence itself.  It is. difficult to lay down any very clear line of admission or exclusion where the exclamation refers to the feelings of the moment.  But we think it would not be safe to receive such testimony in any case where it is not the natural and ordinary expression of pain, called out without purpose, or in the course of medical treatment.  The unstudied expressions of daily life, or the statements on which a medical adviser is expected to act, and which, if feigned, he should have skill enough to subject to some test of truth, stand on a footing which removes them in general from suspicion.  But we cannot think it safe to receive such statements which are made for the very purpose of getting up testimony, and not under ordinary circumstances.  The physicians here were not called in to aid or give medical treatment.  The case had been relinquished long before, as requiring no further attendance. They were sent for merely to enable the plaintiff below to prove her case.  The whole course of the plaintiff was taken to no other end.  She had in her mind just what expressions her cause required.  They were therefore made under a strong temptation to feign suffering if dishonest, and a hardly less strong tendency, if honest, to imagine or exaggerate it.  The purpose of the examination removed the ordinary safeguards which furnish the only reason for receiving declarations which bear in a party's own favor.

"The general rule in regard to other classes of hearsay evidence and statements admitted upon the same principle is that they must have been made *ante litem motam*, which is interpreted to mean not merely before suit brought, but before the controversy exists upon the facts.  *Stockton v. Williams*, Walk. Ch. 120, 1 Doug. 546 (citing the *Berkeley Peerage Case*, 4 Camp. 401; *Richards v. Bassett*, 10 Barn. & C. 657; *Doe d. Tilman v. Tarver*, Ryan & M. 141; *Monkton v. Attorney General*, 2 Russ. & M. 160;. *Whitelocke v. Baker*, 13 Ves. 514).  The language of Lord Eldon in *Whitelocke v. Baker* has met with general acquiescence.  He says:

"'All are admitted upon the principle that they are the natural effusions of a party who must know the truth, and who speaks upon an occasion when his mind stands in an even position, without any temptation to exceed or fall short of the trute.' Page 514.

"It is not necessary to consider whether there may

not be properly received in some cases the natural and usual expressions of pain, made under circumstances free from suspicion, even *post litem motam*. The case must at least be a very plain one which will permit this. The present controversy presents no such difficulty. The physicians were called in, not to give medical aid, but to make up medical testimony; and the declarations were made to them while engaged in that work. It would be difficult to find a case more plainly within the mischief of the excluding rule."

While we adhere to the rule permitting such testimony in proper cases, we do not feel inclined to extend it beyond the necessities of the case, nor to cases clearly within the exception noted in the Huntley case.

The fact that the physician is employed for the express purpose of giving his testimony in a case does not, for that reason alone, make him an incompetent witness; nor is his testimony incompetent for that reason. It certainly may be considered by the jury as affecting the credibility of the witness and the weight the jury should give to his testimony. But the reason why such testimony is incompetent when given by third persons, either as original or corroborative testimony, is that it is giving in evidence the *ex parte* statements of a party to a suit upon points material to the issue, and made for the purpose of being testified to and given in evidence in a suit already pending or to be brought. Such testimony is incapable of contradiction. It has all the evils of manufactured testimony, without any possible means of detecting the falsity of it. In this State a party can testify to his sensations of pain and of suffering, mental or physical, but he cannot be allowed to corroborate such testimony by witnesses employed to listen to such statements with a view to a suit to be brought or pending. In this case the plaintiff had been sworn, and detailed her condition and sufferings, and then introduced the

two physicians employed with a view to bringing suit, to whom she had stated her condition and pains and suffering, who corroborated her by swearing to such statements. Not only this, but they were permitted to testify to what plaintiff said as to her feelings and sensations of pain after suit brought, and even during the trial of the cause. This was plainly error, as held in the case of Huntley.

Dr. Grant, upon being examined in chief, testified to her condition on the occasion of his first visit, as learned from Mrs. Jones, the plaintiff. The record shows the following to have occurred:

" *Q.* What did she represent to you as to her condition? (Objected to as incompetent, on the part of the defendant.)

" *Mr. Davis:* I think we have a right to know upon what he bases his opinion or conclusion, if he had come to any.

" *The Court:* I suppose what answer she made to the physician would be evidence as to her condition.

" *Mr. Ellis:* Take an exception.

" *A.* She stated how she had received the injury. It is not necessary to go over that any more.

" *Q.* I want to know just what she told you about it.

" *A.* She stated that she had received the injury from a fall, catching her heel in a walk going down town a few days previous, and had fallen in such a way as to severely strain the right knee-joint, so that it was doubled under her in such a way as to—

" *Q.* How did she describe this doubling under, doctor? Can you tell how that was? (Objected to as incompetent.)

" *The Court:* If she did not describe it, of course that would end it. I don't think that would be proper; what she said how she fell at that time would be proper."

This testimony should have been excluded. It was another method of corroborating the party in a material part of the case by her own statements. *Dundas v. City of Lansing,* 75 Mich. 499; *Merkle v. Bennington Tp.,* 58 Id. 156; *Roosa v. Loan Co.,* 132 Mass. 439.

The injury in this case was alleged to have been caused by a defective cross-walk. Counsel for plaintiff asked a witness the following questions:

" *Q.* How is the walk right straight along for 80 rods this side of Dorman's residence to-day?

" *A.* It is bad.

" *Q.* Is it not true that in three or four places there are six inches of plank gone, and holes in the walk?

" *Mr. Ellis:* I object to the question, and ask to have the last answer stricken out.

" *The Court:* I am inclined to think the other party tried to get in something like that."

Then followed an offer made by Mr. Davis, and the record proceeds as follows:

" *Mr. Davis:* They did. Their offer was simply for the purpose of showing that Dr. Dillinbaugh did not know where this was; that it was somewhere in the city; his attention was not called to it. My object is to show that at this very time and at the present time these walks are in such condition that it is unsafe for aged people or infirm people to pass over them to-day,—right along this street, for upwards of 80 rods. I am perfectly willing they should go into that if they go on the ground they intended to go in to show that they are giving it that careful examinat on they are attempting to show. They have offered to show the safe and nice condition of things. I say they are not safe for a man that was in any way infirm, or for a lady, to go along there at night without being injured or tripped up a half dozen times there in that walk.

" *Mr. Ellis:* I object to the statements out of order, not directed to any particular walk.

" *The Court:* I don't think it is best to go into an investigation of all the sidewalks in Portland. I am a little fearful that it would be too long. Better confine ourselves to this particular cross-walk.

" *Mr. Davis:* Make it with a view of showing the general unsafe condition at that time and since. The committee on streets had had them in charge with one in question.

" *Mr. Ellis:* I object to it; object to his making it to the jury. He can't prove anything of the kind in the case. I take an exception to the offer.

"*The Court:* We will not go into it."

The offer made by the plaintiff's counsel in the presence of the jury was improper, and directly in conflict with at least two decisions of this Court,—*Dundas v. City of Lansing*, cited above, and *Tice v. Bay City*, 78 Mich. 209. When an offer is so made in the manner this was, with the assertion on the part of the attorney that the walks "right along this street for 80 rods are not safe for a man that is in any way infirm, or for a lady, to go along there at night without being injured or tripped up half a dozen times there in that walk," and such statement and offer are objected to, and nothing is said by the court to correct such error in practice, it is reversible error. The impression which the jury must have received from the offer and statement, as well as from the testimony of the witness, which the court did not on motion strike out, was necessarily detrimental to the defendant. The court, instead of saying to the attorney that his offer was improper, and contrary to the law as laid down by this Court, and should not have been made in that manner and with the assertion of fact by the attorney, and instead of cautioning the jury not to be influenced by it, merely said:

"I don't think it is best to go into an investigation of all the sidewalks in Portland. I am a little fearful it would be too long. Better confine ourselves to this particular cross-walk."

And again, "We will not go into it." It left the jury to infer that, if it had been gone into, the assertion made by the attorney would have been substantiated by other testimony; and the attorney got before the jury the same effect of this immaterial testimony as if it had actually been introduced.

Objection is made to a question asked Dr. Grant as an

expert witness. The record shows the following to have occurred:

"*Q.* Doctor, I want to ask you this question: Now,. suppose a woman 48 years old, free at the time from rheumatism, and in good health, one year previous having had a severe illness known as 'malarial fever,' and which confined her to the house for some 13 week; and some six or seven years prior to that time having had some sickness of the lungs,—lung difficulty; and in 1864, while in a hospital in the South, had the small-pox; not having menstruated for about one year; never had any difficulty with her back, except what she terms 'back-ache,'' brought on at monthly periods;—

"*The Court:* Leave out 'brought on,'—that she had back-ache at the time of monthly periods.

"Her uterine organs never having troubled her; never having had any trouble with her hip or the small of her back,. except the back-aches spoken of, at the time spoken of;. but three years previous had injured her left knee, by striking it against a stick of stove-wood, while putting it into the stove, to that extent that the injury terminated in what is known as 'dropsy of the knee,' and for which she wore a rubber knee cap until about three months previous to July 20, 1888, from which time until the 20th of July the said left knee was apparently as well as ever;. and that about one year previous to July 20, 1888, she knelt upon the damp ground for about one-half hour, and upon her right knee; and that as a consequence she found swollen condition; but that upon application of iodine she found the next morning—

"*The Court:* Change that 'as a consequence,'—that it was followed by that; after kneeling down there it was. followed by swollen condition:

"That after kneeling down it was followed by swollen condition; that upon the application of iodine the next morning she found that the knee was apparently as well as ever; that about three or five months previous to July 20, 1888, she again knelt down upon the ground and upon her right knee, and it again appeared to be swollen and slightly painful, and continued for a period of about six weeks; that she then applied, during this time, iodine, and after three months—but for three months prior to 20th of July, 1888, she had no trouble with said knee, that is, the right knee; the same appeared to be well, to

have entirely recovered from the difficulty; having no
tenderness of the muscles through the small of the back
or the lumbar regions, or pain or tenderness of the genital
organs, no ecchymosed condition of the tuberosity of the
*ischium,* no pain or inflammation in the sacro iliac joint
or the muscles covering the same—should catch her left
heel in a hole in the cross-walk, and, for the purpose of
protecting herself, throwing her right foot back, and
doubling her right foot under her right leg, and fall in
that position upon the left hip and side, becoming uncon-
scious, or nearly so, by reason of the suddenness of the
fall, her left foot becoming loose in the mean time, and
upon getting up she walked a distance of about 1,150
feet in going home, with great difficulty, being obliged
to go from side to side, suffering great pain in the groin,
extending to the front of the body, with pain in the
back, and upon reaching home obliged to go to bed, and
the next day after such accident suffering great pain in
her left groin, back, and front of her body, suffering
intensely while lying on her left side, being unable to lie
on her right side on account of pain in her right knee,
being obliged to lie on her back, and in a position to
have a pillow under her right knee, suffering pain in her
left heel; also with a pain in the back of her neck, or
drawing in back of her neck, so that she had to have a
pillow under it to keep her head from going forward;
that five days afterwards you find upon examination the
right knee in a semi-flexed condition, and upon compari-
son with the left knee you find that the right knee is
about an inch larger than the left at certain points, and
where resistance is least you find a puffiness at the side
of the *patella,* also fullness or prominence above the knee,
and the joint very tender, especially when you attempt
to extend it; finding no contusions or bruises on the
surface whatever, and skin apparently normal; left knee
being in apparently a normal condition; finding upon the
left hip, a little outside the tuberosity of the *ischium,*
ecchymosed condition; finding no dislocation of knee-joint
or no fracture; more bruising of the tissue there upon
upper part of hip-joint; near sacro iliac joint, or the
muscles covering the same, you find tenderness, with no
bruises. Passing to the lumbar region, you run your
finger over the occipital bone from the upper part of the
spinal column all the way down, and find tenderness on

the left side of the spine in the lumbar region, and the patient complaining of extreme pain when attempt is made to put the muscles in action; upon pressure, finding over the pubic and left groin very much tenderness and pain complained of by patient; also in neighborhood of pubic bone. Upon digital examination of *vagina*, you find, upon placing your finger upon the neck of *uterus*, extreme pain is complained of by patient; attempting to impinge ovary, you find that this manipulation causes so much pain that the patient was unable to bear it, according to her statements; and coming to the conclusion that the trouble was with the left ovary and congested state of the womb, the temperature being 99, heart irritable, pulsation 96, bladder irritable, left ovary very tender upon pressure. Upon your second examination, which was on the 11th day of August, 1888, you find that the swelling in the knee has been reduced to one-half inch less, pain and tenderness in the muscles of the neck, in genital organs, and patient unable to bear her weight upon her right foot. Upon third examination, which occurred about the 18th of September, you find same symptoms, with slight modification in the reduction of swelling and the lessening of pain and tenderness in the right knee and muscles. Upon fourth examination, which occurs upon 17th day of October, you find her still unable to extend her right knee, with slight modification of pain and tenderness in the right knee, hip, and genital organs. Upon fifth examination, made night before last, you find contraction of the external and internal tendons, 16 months' time having elapsed from date of first examination to that of last,—what would you say as to probability of absolute recovery of patient from all these conditions which you found her in at the time of your first examination?

"*Mr. Ellis:* Objected to. The trouble with the question is that without describing it, same condition, you find tenderness; you find tenderness there,—different parts.

"*The Court:* Where it states that you find tenderness upon the examination, that may be changed,—that the patient complains of tenderness and pain, complains of tenderness at those points.

"*Mr. Ellis:* Also that he assumes—the question does—that the left knee was in normal condition.

"*The Court:* At what time?

"*Mr. Ellis:* At the time of the examination by the doctors.

"*The Court:* The first one?

"*Mr. Ellis:* Yes, sir.

"*The Court:* There is some evidence by the doctor, certainly, that he found it in normal condition at that time. Then there is some evidence to base it upon.

"*Mr. Nichols:* This doctor himself says it was.

"*Mr. Ellis:* The other doctor said it was not. Also, at the time of the third examination, the patient was unable to bear her weight upon her right limb. There is not any evidence of that kind.

"*Mr. Nichols:* I said the second examination. I don't say the third.

"*The Court:* Well, change that,—that the patient saying that she was unable at that time, at the time of that examination, to bear her weight upon the limb. Anything further?

"*Mr. Ellis:* I object further to the question that it is so long, and contains so many disputed propositions; also contains a decision or determination that the doctor made at the time of the examination.

"*The Court:* What decision do you refer to?

"*Mr. Ellis:* Concerning the cause of the trouble of the internal organs at that time; so much so that he decided so and so at the time. There is not any evidence that this doctor decided that.

"*The Court:* There is evidence that this doctor decided something about the knee.

"*Mr. Ellis:* Oh, yes, but nothing about the genital troubles.

"*The Court:* What do you say in your question about decision as to genital organs?

"*Mr. Nichols:* Extreme pain in attempting to impinge ovary between your fingers. This manipulation she was unable to bear; coming to the conclusion that the trouble was with the left ovary. Dr. Logan swears to that.

"*The Court:* There is something to base that upon,— that is, in the opinion of one physician who examined it. Now, anything further?

"*The Court:* I guess I will let him answer. (Exception for the defense.)

"*The Court:* If you want anything added to, add to it.

"*Mr. Ellis:* I haven't any requests to make. It is in the same condition that it was before.

"*The Court:* ·Our Supreme Court has decided as to those questions. When the court asks counsel to point. out defects it is their duty to do so.

"*Mr. Ellis:* There was the condition about this excessive flowing afterwards.

"*Mr. Nichols:* I will add, then, that some seven days afterwards—

"*Mr. Ellis:* Also doesn't contain medicine that the woman had been taking during that time.

"*Mr. Nichols:* Five days after the injury complained of by the patient—after the 20th—menstruation commences again, and continues for some time excessively, then ceases for a short time, and then again commences, and continues for the period of eight weeks without cessation, in excessive degree.

"*The Court:* Did you state about her having lung trouble?

"*Mr. Nichols:* Yes, sir.

"*The Court:* She had lung trouble some six or seven years ago, and coughed considerably.

"*Mr. Ellis:* It doesn't state what was taken, or what had been done with the patient, or the care she had had, or the place of these examinations, or where she had traveled to make these examinations from time to time, nor the medicine or care that she had had during that time. It seems to me that would be necessary, so that you could tell whether they were permanent or not. Whether she had run along without any care, what it was, the medicine that was given her, would be material.

"*The Court:* Well, based simply upon what is included in the question, you may answer it, doctor. (Exception for the defense.)

"*A.* You want to know as to my opinion of the permanency of all these disabilities mentioned?

"*Q.* Yes, sir.

"*A.* Well, I have to exclude everything except the disability to the knee-joints.

"*Q.* Very well then, what can you say about that?

"*A.* As I believe, the others are not permanent. I think I answered the same question this forenoon,—that I believe the injury or the disability to the knee-joint was permanent."

In *Mayo v. Wright*, 63 Mich. 32, we held that it was no objection to a question asked an expert witness that it was too lengthy; but we also held that it should be reduced to writing, and embrace the whole question in a connected manner. We think this question is open to the criticism made upon it in so far as relates to the disconnected method of propounding it. It undoubtedly contains, however, the elements of what the plaintiff bases her right to recover on for the injury caused by the negligence of the defendant, which, upon examination of the question, turns out to be more in the aggravation of existing ills than any definite new injury caused to plaintiff.

Following the expert question above referred to, the following was asked of this witness:

"*Q.* Taking into consideration simply these things that were asked you on this question, to what would you attribute the condition that you found the patient in at the time of your examination?"

This was objected to as incompetent.

"*The Court:* I am inclined to think that is proper. Leaving out now everything except what was stated to you in this hypothetical question, then what, in your judgment, caused the condition in which you found her?
"*A.* As to the cause?
"*Q.* Yes.
"*A.* Why, it seems to me there could be but one conclusion, knowing the history of the case and all,—that it resulted from the fall. It doesn't take a medical expert to answer that question, does it?"

This was improper. It was usurping the province of the jury. The witness was permitted to testify to a conclusion, contrary to our own decisions. *Dundas v. City of Lansing*, 75 Mich. 499; *Tice v. Bay City*, 78 Id. 209.

The judgment must be reversed, and a new trial granted.

The other Justices concurred.