137   541
141   *5* 21
142   *3*268

## COMSTOCK *v.* TOWNSHIP OF GEORGETOWN.

1. DAMAGES — PLEADING AND PROOF — NATURAL EFFECT OF AL-
LEGED INJURY.
   Under a declaration alleging injury to an arm, the effect of
   such injury on the use of the hand may be shown.

2. SAME.
   Under a declaration alleging that plaintiff's face was cut and
   bruised, it may be shown that this affected his mouth, so that
   he could not open it, and, as a consequence, his speech and
   ability to eat were affected.

3. EVIDENCE—HEARSAY—EXPRESSIONS OF PAIN.
   Expressions of pain, vocal or otherwise, made to physicians
   called by plaintiff, not to give medical aid, but to make up
   medical testimony, are inadmissible.

4. BRIDGES—EVIDENCE—RELEVANCY—SETTLEMENT WITH OTHERS.
   In an action against a township for injuries received from the
   breaking of a bridge by a traction engine, plaintiff, who was
   driving it, cannot show that the township has paid the owner
   for taking it from the stream.

5. EVIDENCE—OPINIONS AND CONCLUSIONS.
   In an action against a township for injury from the breaking
   of a bridge, witnesses may not testify that the bridge was
   reasonably safe for public travel; that being the question for
   the jury.

6. BRIDGES—DEFECTS—NEGLIGENCE—EVIDENCE.
   Where plaintiff drove an engine, with a tank full of water,
   on defendant's bridge, which broke thereunder, evidence that
   it was the general practice of those having such engines not
   to take tanks on bridges with the engines, is competent on
   the question of defendant's negligence and plaintiff's contrib-
   utory negligence.

7. SAME—WARNING—CASUALTY.
   Where plaintiff, before driving an engine on defendant's bridge,
   was warned by the highway commissioner that the bridge
   was of doubtful strength, and advised to use planks on it—
   the commissioner expressing the opinion that it would be
   safe if he kept on the planks, and that probably it would be

safe anyway—and planks were used, but the engine ran off of them, thus causing the accident, defendant was not liable, though the running off of the planks was not due to any negligence of the plaintiff; the accident in such case being but a casualty, and defendant not being an insurer.

8. Same—Care Required—Instructions.

Instructions as to the care required of a township in maintaining its bridges examined and *held* as favorable to the township· as it was entitled to.

9. Damages—Pleading and Proof—Aggravation of Existing Injury.

Under a declaration alleging physical injuries, whereby plaintiff became sore and lame and permanently injured, recovery may be had for rheumatism ascribable to the accident, located in the alleged injured parts, though recovery cannot be had for a mere aggravation of rheumatism, this not being alluded to in the declaration.

10. Bridges—Personal Injuries—Contributory Negligence—Question for Jury.

An instruction, in an action for injury from the breaking of a bridge while plaintiff was driving an engine over it, that plaintiff was guilty of contributory negligence in attempting to drive the engine over the bridge without unhitching the water tank thereof, is properly refused, the question of contributory negligence being for the jury.

11. Same—Notice of Defect—Instructions.

An instruction as to latent defects in defendant's bridge not being notice to it, is properly refused as inapplicable, where it appears that defendant had notice of the defects, and claimed to have informed plaintiff thereof.   ·

12. Trial—Instructions—Requests.

Requests to charge that are sufficiently covered by the general charge are properly refused.

Error to Ottawa; Padgham, J.   Submitted April 15, 1904.   (Docket No. 73.)   Decided September 14, 1904.

Case by Ardon B. Comstock against the township of · Georgetown for personal injuries.   There was judgment' for plaintiff, and defendant brings error.   Reversed.

*Walter I. Lillie* (*Charles O. Smedley,* of counsel), for appellant.

*Lombard & Hext,* for appellee.

HOOKER, J.   The plaintiff was injured while driving a traction engine which broke through a bridge which it was the defendant's duty to maintain.   The action is based upon alleged negligence of the defendant's officers in allowing certain partially decayed stringers to remain in the bridge.   There is some testimony that one or more of the officers had been informed that the stringers were affected to some degree by rot, and the question of notice, as well as the degree of decay, and the propriety of permitting them to remain, were questions for the jury.   A verdict being rendered in favor of the plaintiff, the defendant has brought error.   Counsel have grouped their numerous assignments of error, and, for convenience, the facts pertinent to each question will be stated in connection therewith.

(1) The questions raised under this class of assignments relate to the introduction of testimony as to injuries, and are based upon the claim that the declaration did not warrant proof that plaintiff's hand and arm were injured; that his face was cut; that his mouth "did not work right," and could not be controlled, and that his speech was affected, and that his chin, lips, and nerves were affected; that numbness of the parts was produced, and a thickening of ligaments of the wrist, affecting the use of the tendons.   The declaration, as amended, alleged:

" And he, the said plaintiff, without any fault or negligence on his part, was then and there thrown with great force and violence from and off his seat upon said engine, and upon and against said engine and water-tank wagon and timbers forming said bridge, and the said engine, water-tank wagon and timbers, then and there, because of the premises aforesaid, and without any fault or negligence on the part of the said plaintiff, struck, bruised, and wounded the said plaintiff upon and about his face, head, back, shoulders, spine, and body, and by means of the several premises aforesaid the said plaintiff was then and

there cut, burned, bruised, hurt, and wounded, and permanently injured about his face, head, back, shoulders, left arm, spine, and body, and' on account of which said injuries the said plaintiff became sick, sore, lame, and disordered, and permanently injured in and about his nervous system, face, head, back, neck, shoulders, spine, and body, and has so remained for a long time, to wit, from thence hitherto, during all of which time he has thereby suffered great pain, distress, and mortification, and has been from the time of said injury and will continue to be prevented from performing his usual occupation and has been prevented from earning large sums of money, to wit, two dollars per day, from the time of said injury hitherto, and will continue to be so prevented from performing his usual labor and avocation in a large degree, to wit, during the remainder of his natural life, and has, because of the premises aforesaid, been greatly depreciated in his earning capacity and ability to labor, and has heretofore since the injury been confined to the bed for the period of, to wit, three weeks, and entirely unable to earn any sum of money whatever, which said time was worth the sum of two dollars per day, and will hereafter during his natural life suffer great pain, distress, and mortification, and was thereby and will continue to be thereby permanently prevented from carrying on his business of a farmer and thresher, in which, to wit, on the day and year aforesaid, he was engaged in active work, and from which he was making large gains and proceeds, to wit, fifteen hundred dollars ($1,500) per annum, and was by means of the premises also obliged to lay out and pay large sums of money, amounting to, to wit, the sum of five hundred dollars ($500), in and about endeavoring to be healed and cured of his said wounds, injuries, sickness, and disorder, and will continue to be obliged to lay out and pay large sums of money therefor."

One Dr. Walkley, who never saw the plaintiff until a few days before he was called as a witness, was allowed to testify that he "made an examination of his physical condition." Among other things he said:

"He stood right in front of me. I could tell it was swollen by the abrupt raising. It wasn't symmetrical, like the other shoulder. I examined the spine, and found just one tender point—the seventh cervical vertebra.

" Q. How could you tell that was sore and tender ?

"*A.* Well, he flinched when I was examining it, and he didn't flinch at any of the others, and he said it was sore.

"*Mr. Smedley:* I object to what he said, and move to strike it out.

"*The Court:* Strike it out.

"*Mr. Smedley:* I move that the other be stricken out—that he flinched. He went to this doctor for the purpose of using him as a witness, and it is incompetent for the doctor to testify to anything the plaintiff did—if he said anything or if he flinched. He must testify to things he knows of his own knowledge. He says he learned it was tender because the man flinched, and it is incompetent.

"*The Court:* I will let it stand.

"*Mr. Smedley:* Note an exception.

"*Q.* I will ask you, doctor, whether, from your observation of the man, and the nature of the examination you made—whether, in your judgment, he was feigning that tenderness, or whether it was real?

"*Mr. Smedley:* I object to that as incompetent.

"*The Court:* He may answer.

"*Mr. Smedley:* Note an exception.

"*A.* I think it was real, for he flinched so very prompt.

"*Q.* It came on time?

"*A.* It came on time, and he didn't know where I was going to touch him next."

Dr. Wedgewood was allowed to testify that a week before the trial he made an examination of him, and gave him some medicine; that "he had a slight fever that particular morning, and the pulse slightly accelerated;" and that "he found him tender through the neck and shoulder, and apparently suffering a great deal of pain." This being objected to, again counsel for plaintiff said:

"*Q.* I will modify the form of the question, and ask you— I think you stated a moment ago you found tender spots. Could you tell from his actions and appearance whether or not your examination of those parts produced pain?

"*Mr. Smedley:* I object to that as incompetent.

"*The Court:* I think he may answer.

"*Mr. Smedley:* Note an exception.

"*A.* They did— The examination did produce pain.

"*Q.* How could you tell that, doctor?

"*A.* A man naturally would—

"*Mr. Smedley:* I object to what a man naturally would do. Let him state what he found and what he saw.

"*A.* Well, I saw, by pressure and percussion over the neck, back, and shoulder, that the man flinched, and gave signs to me that he was sore and suffering pain.

"*Mr. Smedley:* I object to that, and move to strike it out—that he gave signs to him that he was sore and suffering pain.

"*Mr. Lombard:* I will ask what the doctor means by that.

"*The Court:* Let it stand at present. Go on.

"*Mr. Smedley:* Note an exception.

"*Q.* In your judgment, doctor, was he actually sore, or feigning?

"*Mr. Smedley:* I object to that as incompetent. Let him state what he saw.

"*The Court:* He may answer that.

"*Mr. Smedley:* Note an exception.

"*A.* It appeared to me he was sore, and not feigning his soreness.

"*Q.* Did you treat him that morning?

"*A.* I did."

The trial was between four and five months after the accident.

(2) The assignments in the second class relate to testimony given by physicians against defendant's objection. One Dr. Wedgewood was called to treat the plaintiff at the time of the accident and gave testimony regarding his condition and treatment immediately after the accident, and until his convalescence.

(3) Error is assigned to the exclusion of the answer to questions put to defendant's witnesses—e. g.:

"Was that bridge reasonably safe and fit for travel by the public?"

And:

"*Q.* Have you had any experience in traveling with threshing outfits?

"*A.* I have not.

"*Q.* Have you had any experience in knowing and testing the strength of timber?

"*A.* Not to any great extent.

"*Q.* I will ask you whether, in your opinion, that bridge, as you saw it the next day after the accident, would have been strong enough to stand the public travel of any vehicles that was used in 1895 ?

"*Mr. Lombard:* Objected to as incompetent. That is a conclusion.

"*The Court:* That would be calling for a conclusion, purely.

"*Mr. Smedley:* Note an exception."

(4) Defendant sought to show that it was the general practice by those having traction engines not to take tanks upon the bridges with the engines, in support of the claim that plaintiff was negligent in putting the tank on the bridge with the engine, thereby increasing the load upon the bridge some 2,000 or 3,000 pounds. This was excluded.

(5) It appeared by the testimony that the engine was heavier than any other in use in that neighborhood, and that the tank was unusually heavy. It appeared that, before reaching the bridge, defendant's highway commissioner had given plaintiff a warning about this bridge, and advised the use of planks if he should attempt to cross it.

The plaintiff testified :

"There were four run plank, laid end to end. I felt it when the engine went down. It went down all at once. I didn't have time to jump and get off. I didn't hear the timbers crack. I never examined the bridge after this went down. I helped place the run plank. I can't tell from the picture whether the east run plank is under the wheel or not. The west one is."

Fred Kort, owner of the engine, testified :

"After the bridge broke, the wheels on the west side of the engine remained on the planks, and the wheels on the east side was off the plank; that is, the drive wheel. The north end of the run plank was on the west side of the east drive wheel, next to the boiler."

And again :

"I should think that engine weighed seven tons. We tried to have it weighed last fall in Grand Rapids. The scales would weigh something over twelve thousand pounds,

and it wouldn't weigh this engine. We left the counter-shaft and counterwheel and gearing at the bridge, when we took the engine, and had it weighed, and, with all that iron off, the scales wouldn't tell."

And:

"We didn't try to lighten the load at all."

And:

"It went down quick; yes, sir."

Kort then follows that up by apparently trying to show that he saw the east drive wheel on the plank when it started to go down, but admits that the north span of the bridge was as old as the south span, and that they came across the north span all right.

Clarence Comstock testified:

"I was on the east side of the water tank when the bridge went down. I saw the plank was under the drive wheels when they went down. * * * No one else in the neighborhood owns one as heavy. The rims of the wheels in this are more than a foot wide. That one is heavier than other engines used in that vicinity. * * * When the bridge broke, the plank came up four or five feet back of the center abutment. The stringers made them come up. They didn't break off at the center stringer. It was strong enough to raise the plank of the whole bridge back there at least four or five feet."

Fred Vander Veen testified:

"The bridge went right off just like a cannon. It never gave any warning at all. It took a sudden drop right down."

Peter Balkema testified:

"The west drive wheel was on the plank. Instead of the east run plank being under the wheel, it had gotten from under, or was under towards the boiler. The west run plank broke under the drive wheel—didn't break off."

And:

"I examined the run plank on the east side at the point about the drive wheel. It laid beside the wheel and there

were lug marks about three feet from the end, and out-ward like, and down at the end, as though it had chugged over—slid over and down.   They were not of the same nature as the others on the board.   These lug marks were not found the whole length of the plank which it had been over before, but it was bruised and torn as though the engine chugged over as it came down; and I took that as the reason for the plank being from under the wheel at the time."

Orrin Comstock testified:

"The wheel had slipped off the run plank—was right under the cog-wheel.   The plank had slipped on the inside. There were lug marks on the plank.   So I say, according to my judgment, that in falling, or some way, I don't know how—   It looked to me that it jarred off or jumped off in some way.   I don't know how it was done.   The marks looked as though they might have scraped."

John M. Quigley testified:

"The east run plank lay lengthwise inside of the wheels on the west side of the drive wheel under the boiler.   I examined the plank.   It showed he had run up on them about two feet and a half, and the marks were on where the lugs had slipped off and dropped off from the plank. I called the attention of the town board to that."

And this witness further testified that Clarence Comstock said to him when they were looking the work over:

"By God! John, that bridge would have carried that engine all right if we hadn't taken a drop and went off from that plank."

And the same witness testified on redirect examination:

"None of the stringers that broke when the engine went down were broken on the stone wall—the south abutment. They were broken in the center."

The court was requested to charge the jury in relation to this subject as follows:

"If you should find from the evidence in this case that the engine, in passing over said bridge on said run plank, passed in such a manner that the east drive wheel slipped off from the run plank onto the main planks of the bridge

a distance of about three inches, and that at that time the bridge broke, and the engine and tank went down together, then I charge you that such breaking would be no fault on the part of the township; and your verdict would be, 'No cause of action.'"

The court did not give this request, but instructed the jury that:

"There has been some evidence in this case that there were indications that the east drive wheel of this engine ran off the run plank; that, when the accident was over, it was discovered that this plank was not under the east drive wheel; and that there were marks on said plank which would indicate that the drive wheel had run off and dropped onto the bridge. Now, if you find that to be a fact—if you find that the drive wheel did run off of this plank because of carelessness or negligence on plaintiff's part in driving the engine, and dropping three inches onto the bridge, and that the dropping of this heavy weight off of the plank is what caused the bridge to go down—then I charge you that the plaintiff cannot recover. But if you should find that the wheel run off of the plank while the plaintiff was carefully and cautiously running the engine, and without his fault, then such dropping off would not prevent his recovery, so far as this point is concerned."

(6) The plaintiff requested and the court instructed the jury that:

"'Reasonable repair' and 'reasonably safe' mean what the terms imply—in other words, that the timbers of the bridge are reasonably sound and strong, and in a good condition to carry safely a load as heavy as bridges constructed in like manner, of equally as large timbers, ought to carry when reasonably sound and in a reasonable state of repair."

(7) The court also gave the following requests of plaintiff:

"If you find from the evidence in the case that the bridge in question would have been sufficiently strong to hold up the engine and water tank, attached as they were, had the bridge been in a reasonable state of repair, the plaintiff had a right to cross it with the engine and tank in the manner in which he attempted to. * * *

"If this bridge in question, when in a reasonable state of repair, would have borne the load safely, then the weight of this engine and water tank, as compared with other engines and water tanks, would be immaterial, and would make no difference in this case."

(8) The court refused the following request made by defendant's counsel:

"Every man is presumed, under the law, to use ordinary care and caution in protecting himself from harm or injury. That is the duty of every man to avoid danger, and to keep himself from being injured. Actual notice is not required to be given to the traveler on a highway of every specific obstruction. It is enough if he has knowledge that there is a probability of danger; even less—if he has such notice or knowledge of such facts as ought to put him on inquiry. Such notice or knowledge of obstructions or defects in a highway need not be as specific to a traveler in broad daylight as in the night, because a traveler in broad daylight, after having notice or knowledge of facts as ought to put him on inquiry, has the opportunity to observe, and, having the opportunity, it becomes his duty, in order to save himself from injury, to make proper investigation; and if he neglects to make an investigation of a bridge or highway, or if he does investigate, and after such investigation he attempts to cross a bridge or to travel over a highway, having notice or knowledge of such facts as ought to put him on inquiry, he crosses such bridge or travels such highway at his own risk, and cannot recover if injured."

He gave the following, offered by plaintiff's counsel:

"If you find from all the evidence in the case that the plaintiff had no knowledge that the bridge in question was out of repair and unsafe, and you further find that, just before going upon the bridge at the time in question, he met the highway commissioner, who then told plaintiff that he had just come from the bridge, and instructed the plaintiff and his associates to take the two run plank which were at the Wiersam bridge to the big bridge; that there were two planks there; to lay down the four planks, and to run onto the last two, then carry the other two ahead; that they would go over all right; that he thought they would anyway, but they had better use the planks to make sure—the plaintiff had a right to rely upon the in-

formation furnished, and instructions given by the highway commissioner.     *    *    *

" The plaintiff, if he had no actual notice that the timbers of the bridge were decayed, or that the bridge was out of reasonable repair, had a right to rely upon the information and instructions received from the highway commissioner on the same day, and shortly before attempting to cross the bridge. It was the duty of the highway commissioner to see that the bridge was kept in a reasonable state of repair, and reasonably safe and convenient for public travel; and if you find that the said commissioner stated to the plaintiff, or in his hearing, that he had just come from the bridge, the plaintiff had a right to presume that said commissioner knew the condition of the bridge, and had a right to rely upon the information and instructions given to him or in his hearing concerning the condition of the bridge, and the manner or method to be pursued by them in crossing the same."

(9) The court charged that:

" If you should find for the plaintiff, and should further find that because of the injuries received, at the time complained of, to his arm, shoulder, back, spine, and neck, he became lame and sore in and about the same, and has suffered any pain, or will continue to suffer pain, in the same, the plaintiff will be entitled to recover full compensation therefor, even though the same be of a rheumatic nature, providing you find the same has affected or become seated in the part mentioned because of the said injuries received."

The amended declaration states:

" Without any fault or negligence on the part of the said plaintiff, struck, bruised, and wounded the said plaintiff upon and about his face, head, back, shoulders, spine, and body, and, by means of the several premises aforesaid, the said plaintiff was then and there cut, burned, bruised, hurt, and wounded, and permanently injured about his face, head, back, shoulders, left arm, spine, and body, and on account of which said injuries the said plaintiff became sick, sore, lame, and disordered, and permanently injured in and about his nervous system, face, head, back, neck, shoulders, spine, and body, and has so remained for a long time, to wit, from thence hitherto."

Plaintiff testified:

"I might have had rheumatism for five years. Don't know how bad. Had it in my hips, mostly, and one side of my back. Just streaked across the point of my hips and down part way in my legs. It used to streak down, but never went up. I don't remember, but I might have limped a little from the effects of rheumatism five years ago. Sometimes I have it worse than others. I don't hitch unless I have rheumatism. When it hurts me I limp, and whenever I limp it is on account of rheumatism."

(10) Error is assigned upon the refusal to give the following requests bearing upon the question of contributory negligence:

"I charge you that the evidence in this case shows that the plaintiff was guilty of negligence in attempting to cross this bridge without unhitching the water tank, and that his negligence contributed to the injury, and therefore the plaintiff cannot recover, and your verdict should be, 'No cause of action.'

"It was the duty of the plaintiff, when he was notified and warned by the highway commissioner in regard to this bridge, to use more than ordinary care in crossing it; and even the warning given to the plaintiff by the highway commissioner, according to the plaintiff's own testimony, was sufficient notice to put him on his guard, and, after receiving the notice that he says he received, if you find that the plaintiff still attempted to cross this bridge with his heavy engine without unhitching the iron water tank, and thus lightening the load, he was guilty of contributory negligence, and cannot recover, and your verdict should be, 'No cause of action.'

"If you find that the plaintiff was notified that the bridge was unsafe on account of the defective stone wall having caved in, yet, even though the accident was not caused on account of the defective stone wall, still this notice was warning enough to put the plaintiff on inquiry, and it was his duty to make an examination of the bridge, and, if he was not sure, it was his duty to lighten the load and unhitch the heavy water tank before attempting to cross the bridge; and if you find that he did not do these things, nor took the ordinary precautions that a prudent man would take, then he is guilty of negligence, and he cannot recover, even although the township was partially to blame.

"The defendant in this case claims that the plaintiff, Ardon B. Comstock, was informed by the highway commissioner, Mr. Quigley, before the plaintiff attempted to cross the bridge in question, that the same was not in good condition for the passage over it of so heavy an outfit as the plaintiff was then running, and that the plaintiff was advised to examine the bridge and determine for himself, and that a set of run planks had been provided for use on bridges on the highway on which this bridge was located, and that if the plaintiff satisfied himself after investigation that the bridge was strong enough, by the use of said run planks, to use the same, but that his crossing said bridge would be at his own risk; that said engine was at least a nine-ton engine, and that ordinary engines used in that vicinity were of about six tons' weight; that attached to this nine-ton engine which the plaintiff was running was a water tank weighing between two and three tons, making a total weight of eleven or twelve tons; that not only did the highway commissioner notify the plaintiff, but that before the notice given by the commissioner, and while the plaintiff was at Mrs. Van Single's, the plaintiff stated that the bridge was in poor condition, but that he supposed Quigley had fixed it, but that he was going across anyhow; that when the plaintiff arrived at the said bridge he got off from said engine, and that others who were with him got off from said engine, and that some examined the bridge, and that after the examination of said bridge the plaintiff made the remark, 'Well, by God! I am going to get on and take her across,' and that after making that remark he got onto said engine and started to take said engine and tank across; that in going across, and while on the south span of said bridge, the east drive wheel of said engine slipped off the run plank, and took a drop of at least three inches, and that this drop caused said bridge to give way under the drive wheels of said engine; that afterwards, in conversation with one Otis Lowing, the said plaintiff admitted that the breaking of said bridge and the injury to him was his own fault; and that afterwards the said plaintiff admitted to one E. C. Conklin that the injury he received from the breaking of said bridge was his own fault, and that he had been warned by the commissioner in reference to said bridge.

"I instruct you that, although you may believe from the evidence that the defendant township had negligently suffered this bridge to be and remain in an unsafe condi-

tion for driving traction engines of the weight of this engine upon and over it, still, if you also believe from the evidence that such unsafe condition of the bridge was known to the plaintiff before and at the time he attempted to drive this engine upon and over the bridge, and if, knowing that said bridge was unsafe and out of repair, he attempted to drive this engine upon and over said bridge, and did drive it upon the bridge, he would not be using due care and prudence to avoid an injury, which the law in this State requires, but plaintiff would in such case be guilty of contributory negligence; and, if you so find the facts to be, you must find a verdict for the defendant, 'No cause of action.'"

(13) Counsel for defendant requested the following instructions:

"The burden of proof is upon the plaintiff throughout the whole case. He must satisfy you by a preponderance of the evidence that the injury complained of was caused by the negligence of the defendant township. He must satisfy you by a preponderance of the evidence that, if the bridge was unsafe, the defendant township had notice of it, and had reasonable time to repair the same after such notice. He must satisfy you by a preponderance of the evidence that he (the plaintiff) had no notice of the unsound condition of the bridge, if the same was unsound, and that he took ordinary care and precautions to avoid any injury. And he must satisfy you by a preponderance of the evidence that the injury he claims to have received was not caused by his own fault or negligence. And unless he does so satisfy you by a preponderance of the evidence, then your verdict will be, 'No cause of action.'"

(14) Error is assigned on the failure to give the following request:

"Township officers are not expected to have the knowledge of experts, and they are not obliged to use the same knowledge that an expert would use. The law only requires them to use such ordinary care as prudent officers would use, and they are not liable for defects in a bridge which are latent—that is, defects which cannot be seen; and if you find that the outside of these timbers looked sound, and, on being tested with an ax, sounded all right, yet, if you find that the interior was rotting to such an ex-

tent it weakened the bridge, still the township is not liable for these defects which cannot be seen by the naked eye, nor discovered by pounding on the timbers with an ax. Therefore you have a right to take into consideration the fact that these rotten spots on the interior of these timbers are not notice to the officers of the township."

(15) Defendant's 23d request was as follows:

"I charge you, as a matter of law, that the failure of a township to keep a bridge in a reasonably safe condition for public travel is not ground of liability, and the plaintiff cannot recover unless knowledge or notice of the existence of the defects which caused the bridge to break down was given to the township officers, and an opportunity to remedy it be shown, and that such notice cannot be inferred from a mere failure to seasonably inspect the bridge."

(16) Defendant's 32d request was as follows:

"There is no general rule for determining when causes are proximate and when remote, but in actions for damages, such as this, it becomes necessary whether, if the plaintiff in the case was guilty of contributory negligence, that negligence was proximate and contributed to the injury; and in this case, if you should find that the defendant township was careless in leaving the bridge in the condition that it was, and at the same time you should find that this carelessness was antecedent to the negligence of the plaintiff—if you should find negligence on the part of the plaintiff—and that the plaintiff might by ordinary care have discovered the failure of the township to use such care in time to have avoided the injury, there can be no recovery, because the intervening negligence of the plaintiff would be the direct and proximate cause of his injury."

It is said that the court erred in refusing to submit the following question to the jury:

"Even although the township might have been to blame, did the conduct of the plaintiff, Ardon B. Comstock, by his recklessness or negligence, have anything to do with causing his injuries?"

Before entering upon a discussion of the various assignments of error, which exceed 90 in number, and the re-

quests to charge, which aggregate upwards of 50 upon both sides, many of them lengthy, and many of them involving a statement of the testimony, or conclusion upon the same, we venture to suggest the annoyance to the trial court of requests of such a character, covering 17 printed pages of the record.   It is the province of the jury to pass upon controverted facts, and the court should not be asked to do it.   On the other hand, there ought not to be great difficulty in presenting questions of law intelligibly, and so that the court will understand and apply them, without writing a charge for him.   The theory of the law is that the court, and not counsel, will prepare the charge; and we cannot wonder that courts are reluctant to impair its directness and lucidity by long requests, many of them argumentative, by reason of their application, or to indulge in the more befogging practice of reading a series of requests for the respective parties as a substitute for a charge.   It appears to us that while requests have their office, and there is no intention to indicate an arbitrary limitation upon counsel's exercise of an undoubted right and a useful function, yet we think the requests in this case might have been shorter and fewer without harm to the parties, and possibly without so much danger to the verdict.

1. It is contended that the declaration did not lay a foundation for the proof that:

"That hand you see, I cannot shut it as naturally as I do this one.   This is caused by the bruise.   I cannot use that arm.   I cannot grasp anything with that hand like I can with the other."

And again:

"This cut from my eye down was from that, and over here you can see that scar.   The mouth doesn't work right.   Any man can see that it affects my speech."

Again, speaking of the injury to the face:

"It [the face] has a hard, numb feeling.   It feels hard. * * * I cannot handle my lips, my mouth, anywhere

nigh like I could if I didn't have it.  *  *  *  I spit all over.    I can't spit like I used to.    I slobber all over.    I cannot control my lips and mouth in the usual way.  *  *  * My lips—  All I could get in my mouth was the flat of a teaspoon—the handle.    That was all I could get between my teeth.    All the way I could eat anything was just to suck it in—just milk.    That is all I could get into my mouth."

The declaration says nothing about the hand, but it complains of the injury to the arm.   In showing the effect of the injury to the muscles, ligaments, and tendons, it appeared that the consequence was an impairment of the hand, which was the natural effect of such injury, and consequently one that defendant should have understood to be covered by the declaration.

The same is true of the cut and bruised face.   It affected the mouth, and perhaps every other part of the face.   It was competent to show that he could not open his mouth, and, as a consequence, his speech and ability to eat were affected.

We do not discover that any claim is made for an injury to the eye.   It was competent to show the cut in the face, and the consequences, such as the scars, numbness, and effect upon the lips.   These matters seem well within the rule laid down in the cases of *Montgomery* v. *Railway*, 103 Mich. 46 (61 N. W. 543, 29 L. R. A. 287), and *Snyder* v. *City of Albion*, 113 Mich. 279 (71 N. W. 475).

2.  Dr. Walkley was called to show plaintiff's condition shortly before the trial.   He saw him first a week before the trial.   After testifying to some visible physical conditions that were abnormal, he testified that certain parts were sore and tender, and, when asked how he could tell, said:

"Well, he flinched when I was examining it, and he did not flinch at any of the others, and he said it was sore.  *  *  *  I think it was real, for he flinched so very prompt.

"Q. It came on time?

"A. It came on time, and he didn't know where I was going to touch him next."

On cross-examination he said:

" All I know about its being tender is that he flinched when I touched him."

The judge struck out what the plaintiff had said about its being sore, but allowed the testimony as to his flinching to stand.    This witness was not called to treat the plaintiff, and it is inferable that his examination was for the purpose of obtaining information as a basis for testimony to be given at the instance of the plaintiff.

In the case of *Grand Rapids, etc., R. Co.* v. *Huntley*, 38 Mich. 544 (31 Am. Rep. 321), the court was considering the admissibility of exclamations of pain, and said that:

" It is difficult to lay down any very clear line of admission or exclusion where the exclamation refers to the feelings of the moment.    But we think it would not be safe to receive such testimony in any case where it is not the natural and ordinary expression of pain, called out without purpose or in the course of medical treatment. The unstudied expressions of daily life, or the statements on which a medical adviser is expected to act, and which, if feigned, he should have skill enough to subject to some test of truth, stand on a footing which removes them, in general, from suspicion.    But we cannot think it safe to receive such statements which are made for the very purpose of getting up testimony, and not under ordinary circumstances.    The physicians here were not called in to aid or give medical treatment.    The case had been relinquished long before, as requiring no further attendance. They were sent for merely to enable the plaintiff below to prove her case.    The whole course of the plaintiff was taken to no other end.    She had in her mind just what expressions her cause required.    They were therefore made under a strong temptation to feign suffering, if dishonest, and a hardly less strong tendency, if honest, to imagine or exaggerate it.    The purpose of the examination removed the ordinary safeguards which furnish the only reason for receiving declarations which bear in a party's own favor."

In discussing the principle under which such testimony is admissible, the writer of that opinion shows that:

" To be admissible, such statements must be shown to be

the natural effusions of a party, who not only knows the truth, but who speaks upon an occasion when his mind stands in an even position, without any temptation to exceed or fall short of the truth."

These were limitations on the rule of admissibility, conditions precedent upon which admissibility depended. See authorities there cited.

In *Jones* v. *Village of Portland*, 88 Mich. 602 (50 N. W. 731, 16 L. R. A. 437), in an opinion by the late Mr. Justice CHAMPLIN, the court emphasized the principle and applied the rule enunciated in the former case. In discussing authorities alleged to support the admission of testimony of the character mentioned, he said:

" In each of them also the exclamations were at a time when motives to make testimony favorable to the party in a suit such party had brought or contemplated bringing were absent."

It hardly needs an argument to show that flinching is an expression, if not an exclamation. Like an exclamation, it may be involuntary, or it may be voluntary; and in either case it is in the nature of, or has the effect of, a declaration, and, when taken to indicate suffering, becomes hearsay, if proven by another, and therefore subject to the principle discussed.

In the case of *McKormick* v. *City of West Bay City*, 110 Mich. 270 (68 N. W. 149), Mr. Justice MONTGOMERY so treats such acts. He said:

"So far as expressions or acts of the plaintiff such as could be voluntarily made or simulated were testified to, the testimony was incompetent."

Out of abundant caution, we there reserved the question as to the inflexibility of the rule, having no occasion to hold that in no case could the act be shown; but it was said that in any case "the proof that the flinching is involuntary should be clear, and naturally such exclamations or such acts are subject to be carefully scrutinized, and are open to suspicion."

In *Grand Rapids, etc., R. Co.* v. *Huntley*, 38 Mich. 545 (31 Am. Rep. 321), the court reserved the same question, saying:

" It is not necessary to consider whether there may not be properly received in some cases the natural and usual expressions of pain made under circumstances free from suspicion, even post litem motam. The case must at least be a very plain one which will permit this. The present controversy presents no such difficulty. The physicians were called in, not to give medical aid, but to make up medical testimony, and the declarations were made to them while engaged in that work. It would be difficult to find a case more plainly within the mischief of the excluding rule."

The same may be said in this case, i. e., that it is not necessary to decide upon the inflexibility of the rule; but it may also be said that no number of such reservations amount to a *decision* that the rule is not inflexible, and the danger of such reservations being treated as a negative authority and given undue weight has been adverted to in many cases. Much law has a no more substantial basis. This testimony was not admissible.

Another error is found in the admission of testimony. Counsel for plaintiff were allowed to show that the township board paid for taking the tank and engine out of the stream. That was not admissible. The fact that the township settled with the owner of the engine, if it did so, cannot affect its case with the plaintiff. *Fulton Iron & Engine Works* v. *Township of Kimball*, 52 Mich. 146 (17 N. W. 733).

3. We think the judge did not err in refusing to allow witnesses to testify that the bridge was reasonably safe. That question was for the jury. The witnesses were not asked whether the bridge was safe for the passage of this engine or for ordinary use, but whether it was "reasonably safe for public travel." This was the standard of safety fixed by law, and, to answer the question, the witness must have determined it for himself.

4. It was competent to show that it was negligent to

137 MICH.—36.

take a tank full of water upon the bridge with the engine, and, if it was not customary or necessary to take such heavy loads upon bridges, that fact bore upon the question of defendant's negligence in maintaining a bridge that, while it would carry an engine, would not stand under the added weight of a tank full of water. The common requirements that teams be driven no faster than a walk, and that but 20 head of cattle are permitted upon a bridge together, illustrate the practice of accommodating the load to the bridge which the authorities may reasonably require, and expect if they do not require. If it was true that this outfit was exceptionally heavy, it might be only ordinary prudence to divide the load, and the township might not be negligent in not providing for both at one time. This testimony was admissible.

Again, it bore upon the question of plaintiff's care. It is not a question of his knowledge of a custom, alone, but whether he was as prudent as men generally. In *Aldrich* v. *Monroe*, 60 N. H. 118, it was held competent to show plaintiff's imprudence by evidence that it was customary to chain a wheel in going down a hill, where plaintiff, who did not take this precaution, met with an accident. The question is akin to the custom of railroads, as an evidence of negligence. Good teaming, as well as good railroading, is an element in such cases, if not a standard. See *Kolsti* v. *Railway Co.*, 32 Minn. 133 (19 N. W. 655), where the court said:

" When the question is, did a person use ordinary care in a particular case, the test is the amount of care ordinarily used by men in general in similar circumstances. If it be matter of common knowledge, such amount of care needs no proof. The jury take notice of it. But if it pertained to some special business which the jury cannot be supposed to know, it may be proved."

This testimony was important in connection with the warning that plaintiff received from the highway commissioner that the bridge was in doubtful condition, and, while we are not satisfied to say that he went upon the

bridge at his peril, there is testimony in the case which, if believed, might have convinced the jury of his contributory negligence.

5. Attention has been called to the testimony under this group of assignments, and the request which was refused, and the charge given in relation to it.   Here was a bridge of doubtful strength.   The plaintiff was so informed, and advised to use planks upon it.   The commissioner expressed an opinion that it would be safe if he kept on the planks, and that probably it would be safe anyway.   Upon this state of facts, the planks were used; but who was responsible if the engine ran off from the planks, thus causing the accident?   The judge charged that the township would be liable in such case, unless such running off was due to plaintiff's negligence.   What more should the commissioner have done if the bridge really was capable of carrying the outfit on planks?   Wherein can it be said that he was negligent?   We are of the opinion that, under such state of facts, this was no more than a casualty, and the court practically made the township an insurer against everything but plaintiff's negligence.   The commissioner practically said, "Don't cross that bridge unless you can keep on the planks."   The plaintiff now says, "I did not keep on the planks, as you told me to do, but I ran off by accident, without negligence on your part or mine, and therefore you are liable."   This is not a sound proposition.

6. We think it unnecessary to comment upon these assignments.   The explanation given was as favorable as defendant had a right to expect.

7. The granting of these requests, if not qualified, was error, for the reason that there was evidence which tended to show that plaintiff was admonished of danger.   Possibly this defect in the requests was cured elsewhere in the charge, but it is dangerous to give unqualified requests where the proof shows that they should be qualified.   It is unnecessary to determine whether they were injurious, as the case must be reversed for other reasons.

9 and 10.   We are not satisfied that the case should be

reversed upon these assignments. Apparently the court intended to limit recovery for rheumatism to such as was ascribable to this accident. If, however, the plaintiff already had rheumatism, he could not recover for an aggravation, when there was no allusion to the subject in the declaration. See *Hall* v. *City of Cadillac*, 114 Mich. 99, (72 N. W. 33). The question of contributory negligence was for the jury.

11. This subdivision has been sufficiently discussed in another connection.

12. We have held many times that a township is not an insurer. It ought not to take four argumentative requests to so instruct the jury. We think the court covered this legal proposition in his charge.

13. This request was covered by the charge.

14. Counsel say they were entitled to have this request given, because it was copied from the case of *Township of Medina* v. *Perkins*, 48 Mich. 67 (11 N. W. 810). But it appears that the township officers had notice, and claim to have given information to plaintiff. It was therefore uncalled for.

15 and 16. We think these questions were sufficiently covered by the instructions given.

17. The plaintiff was not injured by this ruling. A substantially similar question was submitted and answered.

The judgment is reversed, and a new trial ordered.

The other Justices concurred.